603 A.2d 568

COMMONWEALTH of Pennsylvania, Appellee,

v.

James LAMBERT, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 24, 1988.

Decided Feb. 21, 1992.

324

Darryl A. Irwin, Arthur Henry James, Philadelphia, for appellant.

326

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Hugh J. Burns, Robert A. Graci, Chief, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS *, Justice.

Appellant was found guilty of murder in the first degree. Following a separate sentencing proceeding pursuant to 42 Pa.C.S. § 9711, he was sentenced to death. We find no error in the proceeding and affirm the judgment of sentence.

The critical facts and procedural history indicate that in September, 1982, three actors, James Lambert, Bruce Reese and Bernard Jackson, agreed to rob Prince's Lounge in Philadelphia. As later testimony established, Reese and Jackson earlier had combined forces to undertake previous bar robberies, while Lambert was a newcomer on this particular occasion. Reese furnished two handguns to be wielded by himself and Lambert in this robbery. Upon arriving at the scene of the crime, Reese and Appellant Lambert proceeded inside while Jackson waited on the street with the car in preparation for the escape. Reese remained poised by the exit stairs, but Lambert went to the bar where he thrust a bag at a barmaid, Janet Ryan, who dashed into the ladies room. Lambert then ordered a second barmaid, Sarah Clark, to open the cash register and handed her a bag. According to Clark's testimony, she then heard two gunshots at that moment and saw one patron slump over the killer and fall to the floor. (T.T., April 11, 1984, pp. 92–93.) Two patrons had been shot to death by the Appellant. Both victims were killed by one actor. The evidence is clear that the actor with the bag was the shooter.

* Reassigned to this writer.

The three men then sped away in the car driven by Jackson. Jackson was arrested on an unrelated crime two weeks later. At that time, he told the police about the robbery of Prince's Lounge and identified the perpetrators and stated that Lambert, then known to him as "Monk" or simply "dude," told him in the getaway car that he (Lambert) had just killed two men inside. Jackson repeated this statement during his testimony at trial. (T.T., April 13, 1984, pp. 116, 119.) [1]

Lambert and Reese also were arrested and charged with murder, robbery, criminal conspiracy, and weapons offenses. At the preliminary hearing, witness Ryan did not appear because she could neither describe the actors nor identify them from photo arrays. There and at the suppression hearing as well, the Commonwealth informed the defense that Jackson alone was the only witness who could identify the two other defendants.

Lambert and Reese were tried together in a jury trial despite the former's motion for severance. Witness Ryan testified on two separate occasions. In her first appearance, she stated that she was unable to identify the actors. (T.T., April 11, 1984, pp. 128–129.) After she stepped down, she approached the prosecutor outside of the courtroom to reveal that, while on the stand, she came to recognize Lambert as the person who had put the gun to her head. (T.T., April 11, 1984, p. 140.) The Commonwealth then sought to recall her over Lambert's objections that her proferred testimony be subjected first to a suppression hearing. The court refused to allow her to be recalled by the Commonwealth. (T.T., April 11, 1984, p. 148).

After the Commonwealth rested, Reese initiated his defense by seeking to call Janet Ryan as his first witness. Lambert's counsel again objected on two grounds: first, that Ryan had been unable to make any prior identification of the person who had approached her; and, second, that

1. Jackson's testimony was in return for an open guilty plea to murder in the third degree, robbery, and crimes related to his previous admitted robberies.

the prosecution should not be given an opportunity to cross-examine her. The trial court ruled against both objections: "it's a different situation ... I felt I couldn't stand in the way of the defendants who has [sic] testimony that was not brought out before. I think there are 2 different situations." (T.T., April 19, 1984, pp. 6, 84.) In his opinion (at p. 11), Judge John A. Geisz reiterated his position that "it is a different situation when the District Attorney is allowed to cross examine any witness called as a defense witness. In this part of the case, the adversary system had switched from a Commonwealth v. Defense into a Reese v. Lambert contest."

On direct examination by Reese's counsel, Ryan then denied that Reese was the person with the bag but followed with a positive in-court identification of Lambert as the actor who had approached her. On cross-examination by the prosecutor, she identified Lambert further from his facial features. (T.T., April 19, 1984, pp. 46, 71–72.)

Each co-defendant denied during the trial that he was the shooter. As a result, the trial proceeded with a great deal of fingerpointing and evidence concerning the height, weight, and facial features of the killer. No other witness in the bar, excepting Ryan's later recollection, and Jackson's statement, was able to identify the actors.

The jury found Lambert guilty of two counts of murder in the first degree, robbery, conspiracy and related offenses on April 25, 1984. The sentencing jury found three aggravating circumstances and one mitigating circumstance.[2] He was sentenced to death for the murders and concurrent jail

---

2. The three aggravating circumstances were: (1) a killing in perpetuation of a felony; (2) in the commission of the offense, the defendant knowingly created a grave risk of death of another person in addition to the victim of the offense; (3) prior conviction for another federal or state offense committed either before or at the time of the offense for which a sentence of life imprisonment or death was imposable. 42 Pa.C.S. § 9711(d)(6), (7), (10). The mitigating circumstance was the absence of significant prior felony convictions. 42 Pa.C.S. § 9711(e)(1) (relative to this mitigation, it should be noted that the prosecution refused to offer evidence at the penalty stage of a prior conviction for bank robbery. See Section V of this opinion).

sentences of five to ten years and ten to twenty years for the other crimes. Reese was found guilty of two counts of felony murder, robbery, and conspiracy and was sentenced to life imprisonment.

Sometime after the trial, Lambert's attorney interviewed Commonwealth witness and co-conspirator, Bernard Jackson, at his request. Jackson purportedly signed an affidavit which stated that Reese had been the killer and that Janet Ryan was a friend of the Reese family and would never testify adversely against him. In December, 1985, counsel requested an evidentiary hearing on after-discovered evidence. Judge Geisz rejected the motion in February, 1986, it appearing that the motion was not promptly filed and the attached affidavits were not properly executed, all in violation of Pa.R.C.P. 1123(d), Post–Verdict Motions:

> (d) A motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery. If an appeal is pending, the court may grant such motion only upon remand of the case.

## I. *Severance*

Appellant alleges abuse and resulting prejudice by the trial court in refusing to grant severance. He advances several arguments to substantiate his conclusion that severance was warranted before and during trial. First, he contends in a general fashion that because he faced a death-qualified jury which was conviction-prone in his estimation, the court should have understood that the possible defenses which might be presented by the two defendants would be adversarial and antagonistic. Without fleshing in his argument with concrete evidence of irreconcilable defenses at the preliminary hearing, his request for separate trials was rejected as being unsubstantiated.

His second argument is that at trial he was not permitted to cross-examine witness Bernard Jackson for the purpose of eliciting information that Jackson and Reese had committed a series of past robberies together. Such information, he alleges, would have sustained his insistence that he was

not the killer in the instant case because neither Jackson nor Reese would have entrusted the important task of carrying a gun to him as a newcomer who had known them for just a few hours before the robbery. The obvious aim of Appellant's strategy was to point the finger at his co-defendant, while exculpating himself on the grounds that, based on the Jackson–Reese robberies, it was more likely that Reese did the shooting.

Jackson's admission to the police that he and Reese previously had committed a string of robberies was made on October 22, 1982. At trial, Jackson was permitted to testify to these prior acts, but the court forbade him to make any references to Reese. (T.T., April 12, 1984, pp. 115ff.) The same prohibition applied to Appellant's cross-examination. In denying an opportunity to implicate Reese in the past robberies before the jury, the court concluded that the aggregate facts of those crimes do not satisfy the standard of "signature crimes" which reveal a unique *modus operandi*. Without proof of a common scheme, plan, or design, the trial court held that evidence of crimes other than that for which the accused is being tried is inherently prejudicial and inadmissible. Reese was being tried on the present charges; evidence of other crimes would have amounted to proof that he was a "bad man."

Third, Appellant forcefully urges us to justify severance based on the fact that Janet Ryan was permitted to be called by the Reese defense to identify him (Lambert) as the person who confronted her in the bar after she had been unable to do so as a Commonwealth witness. The procedure was unfair to him, he alleges, because he was not given an in-camera suppression hearing prior to her taking the stand as Reese's witness and because he had no warning prior to trial that she could identify him.

We conclude that Appellant was not entitled to severance on any of the theories which he advances in this appeal. Separate trials of co-defendants should be granted only where the defenses of each are antagonistic to the point where such individual differences are irreconcilable

and a joint trial would result in prejudice. This determination is left to the discretion of the court which balances the inconvenience and expense to the government of separate trials against prejudice to the defendants in a joint trial, and the burden is on the movant to show prejudice. Prejudice, moreover, should be real, not fanciful, and must be considered together with the desirability of joint trials. Mere inconsistency in defenses is insufficient to denote potential prejudice. The evidence, on the contrary, must be of such a nature and quality that while it will be introduced against one defendant, it will not be admissible against others. Where the jury will infer justifiably that the conflict alone demonstrates that both are guilty, separate trials should be provided by the court. *Commonwealth v. Jackson,* 451 Pa. 462, 303 A.2d 924 (1973); *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied,* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954).

Our standard on this subject was enunciated in *Commonwealth v. Tolassi,* 489 Pa. 41, 49, 413 A.2d 1003, 1007 (1980):

The decision whether to sever cases against co-defendant is one within the sound discretion of the trial court. *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied,* 348 U.S. 875, 75 S.Ct. 112[, 99 L.Ed. 688] (1954); Pa.R.Crim.P. 219. Such a decision will be reversed only where there has been a manifest abuse of that discretion. *Commonwealth v. Lasch,* 464 Pa. 573, 347 A.2d 690 (1975) (opinion in support of affirmance); *Commonwealth v. Patrick,* 416 Pa. 437, 206 A.2d 295 (1965), appeal after remand 424 Pa. 380, 227 A.2d 849 (1967). And the critical factor in one analysis is the prejudice which inures to the accused as a result of the trial court's determination. *Commonwealth v. Peterson,* 453 Pa. 187, 194, 307 A.2d [264], 267 (1973); *Commonwealth v. Lasch, supra,* 464 Pa. at 584–585[, 347 A.2d 690].

See also, *Commonwealth v. Chestnut,* 511 Pa. 169, 512 A.2d 603 (1986); *Commonwealth v. Morales,* 508 Pa. 51, 61, 494 A.2d 367, 372 (1985); and *Commonwealth v. Iacino,*

490 Pa. 119, 415 A.2d 61 (1980). Our most recent reaffirmance of this rule is *Commonwealth v. Patterson*, 519 Pa. 190, 546 A.2d 596 (1988).[3]

▮▮▮ Mere fingerpointing alone—the effort to exculpate oneself by inculpating another—is insufficient to warrant a separate trial. This particular rule is bracketed by one of our most ancient decisions, *Commonwealth v. Place*, 153 Pa. 314, 26 A. 620 (1893) (fingerpointing actually lightens the burden on the prosecution), and our most recent, *Patterson*, 519 Pa. at 197–198, 546 A.2d at 599–600. In the absence of manifest prejudice where the movant is unable to demonstrate the existence of antagonistic or irreconcilable defenses, therefore, our law does not approve of separate trials. On the contrary, the general policy of the law is to encourage joint trials in order to avoid the expense of duplicating evidence in a separate proceeding. *Patterson*, 519 Pa. at 198, 546 A.2d at 600.[4]

▮▮▮ Interpreting these rules, we find no error in the trial court's refusal to grant severance in the case under review here. Appellant's first contention that he was in a hostile posture *ab initio* towards Reese is totally unsubstantiated. They were charged with the same crimes and with the same evidence, both of which stemmed from the same criminal transaction.

▮▮▮ His second assignment of error that he was prejudiced by the court's order prohibiting references to co-defendant Reese in Jackson's statement to the police on October 22, 1982, is equally faulty as mere fingerpointing.[5] The testimony involving other crimes against Reese would

3. Accord are *United States v. Litman*, 547 F.Supp. 645 (W.D.Pa.1982); and *United States v. Barber*, 442 F.2d 517 (3rd Cir.1971).

4. We hasten to add that the same rules governing severance of defendants where substantive crimes are charged apply with equal vigor to charges of conspiracy. In addition to *Patterson*, 519 Pa. at 198, 546 A.2d at 600, see *Commonwealth v. Jackson*, 451 Pa. 462, 303 A.2d 924 (1973) (joint trials for conspiracy are advisable). In accord with our law is *United States v. DiPasquale*, 561 F.Supp. 1338 (E.D.Pa. 1983), *aff'd*, 740 F.2d 1282 (3rd Cir.1984).

5. We note, of course, that Appellant did engage in extensive cross-examination of Jackson under the court's limitation.

be admissible only where they were of the "same class as the one for which the defendant is being tried ... there must be such a high correlation in the details of the crimes that proof that the defendant committed one makes it very unlikely that anyone else but the defendant committed the others." *Commonwealth v. Morris*, 493 Pa. 164, 175, 425 A.2d 715, 720 (1981), relying on *Commonwealth v. Fortune*, 464 Pa. 367, 373, 346 A.2d 783, 786 (1975).

That "high correlation" is missing here. The string of robberies forming the basis of Jackson's statement to the police and to the court, in reality is a hodgepodge of conflicting facts. Some were committed by Reese alone; some by Jackson alone; some by Jackson and Reese with third parties; some by Jackson and Reese where the former merely drove the escape vehicle; and some, indeed, by the two same actors. The list cannot be characterized as "signature crimes." In barring their use against Reese here, the court rightly noted that the evidence would be prohibited as "bad man" accusations even in a separate trial as well.

Janet Ryan's in-court identification of Appellant when she appeared as Reese's defense witness likewise was admissible and did not foist unfairness on Appellant's case. The complaint by Lambert's counsel that he was not afforded a pre-trial line-up opportunity with Ryan obviously fails because there were no identification witnesses, excluding Jackson, at that stage of the proceeding.[6] When she was called as a defense witness for Reese, Appellant's counsel objected (T.T., April 19, 1984, pp. 3–5) but moved for a mistrial only after she identified Lambert from the stand.

6. Appellant's counsel argued on this point as follows:
It's my position that prior to the preliminary hearing, I was court appointed counsel for James Lambert. I was informed by the prosecution that there were no identification witnesses in this case. Mister Myers can verify that. I specified that—I specifically asked him then and I was informed of that.
Now, I had no reason to believe that he intentionally did this but the point is I was precluded from a lineup because I was told that there was no identification in this case other than Bernard Jackson.
(T.T., April 19, 1984, p. 86.)

334

In-court identification, following a prior inability to target a defendant, is clearly admissible, while the weight of that evidence is to be judged by the jury. *Commonwealth v. Silver*, 499 Pa. 228, 237, 452 A.2d 1328, 1332 (1982), and cases cited therein. We add the obvious fact that in a separate proceeding against Appellant, Ryan's testimony would have been admitted in any event. Our rules against duplicative testimony speak effectively to this allegation.

## II. *Bernard Jackson's Statement*

■ As noted above, Jackson told police, and so testified at trial, that during the escape in the car, Reese stated to him that Lambert had killed two persons during the crime. Jackson's statement was:

Toi and the dude got out of the car. I stayed in the car. About 4 minutes later the dude and Tou came running around the corner and jumped into the car. Touche get into the front with me and the dude got in the back. They told me to drive off. So I pulled off driving south towards Baltimore Avenue.... As we were going the dude in the back said he had shot somebody. He said he shot 2 people. I said, what for? He said one of the men jumped up at him and he shot him and the other guy tried to help, so he said he shot him, too. I drove right back out to Darby, the girl's house. (T.T., April 13, 1984, p. 116. "Dude" refers to Appellant Lambert.)

Appellant challenges the admissibility of the evidence as being hearsay, as falling outside of the recognized co-conspirator's exception to the hearsay rule because it was not made in furtherance of the conspiracy, and as a violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[7]

Because Reese's statement was part of the conspiracy dealing with flight from the scene, it falls within the exception. We decided in *Commonwealth v. Coccioletti*, 493 Pa. 103, 111, 425 A.2d 387, 391 (1981): "A well-established

7. Appellant also cites this allegation in support of his severance argument.

exception to the hearsay rule permits the out-of-court declarations of one co-conspirator to be admitted against another co-conspirator provided that the declarations were made during the conspiracy and in furtherance of the common design." Conspirators are "agents" of the conspiracy.

For similar reasons, the *Bruton* rule does not apply to these facts. *Bruton* holds that at a joint trial the admission into evidence of a non-testifying co-defendant's confession which inculpated the other co-defendant being jointly tried with the declarant, violated the other co-defendant's Sixth Amendment right to confront witnesses against him, and further that this encroachment on the other co-defendant's constitutional right could not be cured by the formerly approved practice of having the trial judge instruct the jury to disregard the confession or statement in determining the innocence or guilt of every co-defendant except the confessor himself.[8] Under *Coccioletti*, of course, inculpatory statements made by co-conspirators in their own presence following a crime have a strong indicia of spontaneity and reliability so as to comport with confrontation requirements. We also emphasize the fact that Appellant's counsel undertook a thorough cross-examination of Jackson on the witness chair. No violation of the *Bruton* rule occurred here.

### III. *Death Qualified Jury*

Appellant challenges his conviction on grounds that the trial court allegedly erred in permitting prospective jurors to be "death qualified." During jury selection, the prosecution challenged for cause several prospective jurors who expressed an unalterable opposition to the death penalty. Appellant contends that this practice violates his right

8. *Bruton* overruled *Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). *Bruton* binds federal and state courts as a result of *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), making the Sixth Amendment applicable to the state. We hold in this case under review that the *Bruton* rule is in accord with our state constitution, Art. 1, § 9: "In all criminal prosecutions the accused hath a right ... to meet the witnesses face to face."

to an impartial jury under the Sixth and Fourteenth Amendments. Our court repeatedly has struck down this challenge. *Commonwealth v. Aulisio*, 514 Pa. 84, 522 A.2d 1075 (1987); *Commonwealth v. Smith*, 511 Pa. 343, 513 A.2d 1371 (1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987), construing *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), which holds that the "death qualification" process is consistent with guarantees of a fair trial.

IV. *The Constitutionality of the Death Penalty Statute*

Appellant's following argument is that the death penalty statute, 42 Pa.C.S. § 9711, is unconstitutional because it allegedly imposes no standards by which the jury can weigh aggravating versus mitigating circumstances. In repeated reviews of this subject, we have concluded that the statute passes constitutional muster. Our main concern, of course, is to avoid the risk that the verdict represents the result of arbitrariness by the jury. *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986). Flexibility in this process, nevertheless, does not amount to unbridled discretion, even though a degree of "imperfection" is unavoidable. We held in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 58, 454 A.2d 937, 959 (1982):

Preliminarily, we must reiterate that perfection is not required, nor is it possible—there is no perfect procedure for deciding in which cases governmental authority should be used to impose a sentence of death. *Lockett v. Ohio, supra* [438 U.S. 586] at 605, 98 S.Ct. [2954] at 2965 [57 L.Ed.2d 973 (1978)]. The requirement that the jury must be allowed to consider "whatever mitigating evidence relevant to his character and evidence the defendant can present," *Commonwealth v. Moody, supra* 476 Pa. [223] at 237, 382 A.2d [442] at 449 [1977], mandates that a certain amount of flexibility be built into any capital punishment sentencing structure, and moreover, virtually assures some "imperfection" in sentencing. Yet the requisite degree of flexibility is compatible with the

federal and state constitutions if procedures exist which serve to focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the offender, thus channeling the jury's discretion in order to ensure that, with the assistance of appellate scrutiny, the death sentence has not been imposed in an arbitrary and capricious manner. *Gregg v. Georgia, supra* 428 U.S. [153] at 206–07, 96 S.Ct. [2909] at 2940–2941 [49 L.Ed.2d 859 (1976)] (Stewart, J., Opinion announcing the judgment of the Court); *Lockett v. Ohio, supra* 438 U.S. at 601, 98 S.Ct. at 2963 (it is not required that all sentencing discretion be eliminated, but only that it be directed and limited so that the death penalty will be imposed in a more consistent and rational manner and so that there will exist a meaningful basis for distinguishing the case in which it is imposed from those in which it is not.)

Additionally, we point out that the jury was instructed in the strictest terms to perform the weighing process with all due caution and deliberation.

V. *Definition of the Burden of Proof for Sentencing*

■ At the sentencing stage, the court correctly instructed the jury that aggravating circumstances must be proved beyond a reasonable doubt, while mitigating circumstances take the standard of preponderance of evidence. In defining preponderance of the evidence, however, the court used the phrase "less of a margin than by reasonable doubt." (T.T., April 25, 1984, p. 34.) Appellant now seizes upon the use of the word "margin" to conclude that the jury, therefore, had no standard by which to decide whether to impose the death sentence or life imprisonment. In effect, he insists that the use of the word "margin" confused the jury and thereby prejudiced him.

Our cases have held that an appellate evaluation of a jury charge rests on an examination of the entire statement in determining whether it is fair or prejudicial. *Commonwealth v. Ohle*, 503 Pa. 566, 470 A.2d 61 (1983), *cert.*

*denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986); *Commonwealth v. Wortham*, 471 Pa. 243, 369 A.2d 1287 (1977). We fail to see, and Appellant offers no argument on this point, how the court's definition could have confused the jury on any common-sense basis. In spite of the Appellant's express refusal to offer evidence of any mitigating circumstances, in any event, the jury did find that he had no significant history of prior convictions. In light of this fact, it cannot be concluded that the Appellant was prejudiced, and no relief can be obtained here.[9]

## VI. *Racial Bias in Jury Selection*

■ In this allegation, Appellant complains that the prosecution employed peremptory challenges on a racial basis in order to achieve a jury of eight white persons in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which outlaws "purposeful discrimination" in jury selection. See, also, *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846 (1989).

Appellant's brief, pp. 28–29, is utterly devoid of any specifics whatsoever offered to prove the allegation. Judge Geisz, slip opinion, p. 25, concluded that the "defense has again failed to specify the exact number of illegal challenges alleged to have been made by the prosecutor, nor has he cited any place in the record in support of such unproven allegations. On the other hand, this trial judge has searched the record and there is nothing on the record to indicate that any juror was of any specific race, the defendant never made any request of the court to record the race or racial appearance of any juror." We agree that no basis exists for this assignment of error.

## VII. *Exclusion of Jurors on Religious Grounds*

■ The trial judge posed the following question to each prospective juror: "Do you have any religious or moral

---

**9.** In a related, but separately stated allegation, Appellant argues that the prosecution should have explained to the jury that Appellant had no significant history of criminal convictions since the Judge had found this to be a fact. As indicated herein, the jury found this same mitigating circumstance without the instruction.

beliefs which would prevent you from voting *for* the death penalty in a proper case." (Slip opinion, p. 26.) Appellant contends that jurors were excluded because of religious beliefs which would not permit them to find the death penalty in contravention of Article 1, § 4 of the state constitution, mandating that no person may be disqualified from holding "any office or place of trust" solely "on account of his religious sentiments." Since jury duty constitutes an "office or place of trust," refusal to seat a prospective juror who answered the question affirmatively violates our constitution.

The argument is without merit and was recently rejected in *Commonwealth v. Lewis*, 523 Pa. 466, 567 A.2d 1376 (1989). In addition to the fact that the challenge was not raised at the *voir dire*, jurors were disqualified because of their absolute opposition to the death penalty. The source of that opposition—religious, moral or otherwise—is irrelevant to the law.

VIII. *Definition of "Knowingly" in the Statute*

■ Under 42 Pa.C.S. § 9711(d)(7), the aggravated circumstance is defined as:

In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

Appellant asserts that it was error for the court not to define the word "knowingly." He advances no reason or analysis in support of his claim of error.

In *Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246 (1988), we summarized cases involving definitional vagueness challenges to this very section of the statute. Also see, *Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865 (1986), and *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714 (1984). We determined in those cases that the violent acts themselves enable a jury to find that the actor knowingly created a grave risk of death to others. The jury merely applies the common sense meaning to such terms.

## IX. *Prosecutorial Misconduct at the Closing*

Appellant alleges prosecutorial misconduct in closing remarks to the jury. As best as can be gleaned from Appellant's brief, pp. 35–37, the statements and analyses forming the basis of the complaint include the following. First, the prosecutor said:

> Now, Mister Cannon [counsel for co-defendant Reese] told you that we just got an easy sell; that is, the police officers and the detectives from homicide and the Commonwealth when we took Jackson ...
>
> Well, Jackson earned his deal with the Commonwealth the hard way. When you have any crimes, whether it's economic crime, whether it's a crime of violence such as this or a simple theft, if somebody cannot identify the witnesses [sic], if we have only one perpetrator that's caught, yes, we will make an arrangement, a negotiation, a deal with—to get what we consider are the more serious people.
>
> \* \* \* \* \* \*
>
> [W]e have to enter into negotiations, no matter how distasteful it is for us, to arrive at the other perpetrators. Why? Because if it's within our knowledge, the police, that there were 2 more people on the street, there were 2 more killers on the street that we had to find.
>
> And that's why the deal was made.

(T.T., April 23, 1984, pp. 198–200.)

Appellant insists that it was improper to refer to any accused as a "killer." Additionally, he argues that by referring to "we" as the prosecutor's office with experience in these matters in contrast to "what we consider the more and fair assessment of the evidence. In particular, we have personal interpretations. Lacking any further explanation in this brief, the accusation is conclusory. Appellant appears to be suggesting that somehow such comparisons are morally invidious and lie beyond the pale of acceptable courtroom procedure. Labeling Appellant a "killer" some-

how inferred that he was "more culpable" than co-defendant Reese.

Second, Appellant quotes the prosecutor's remarks (T.T., April 23, 1984, p. 204):

He /referring to Jackson/ didn't isolate himself from the facts in the case. And in every statement he always says Touche tells him that Lambert's the shooter.

And in every statement he says that Touche lays it out that Touche went up to the bar to talk to the barmaid and the other person, Lambert, did the shooting.

Appellant interprets such statements to mean that "Jackson says that Reese says that Appellant is the shooter." (Brief, p. 37.) Under this characterization, Appellant argues that the implication would violate the *Bruton* rule, since Appellant was not permitted to cross-examine witness Jackson on his relationship with Reese while these closing remarks to the jury allowed the prosecutor to use Jackson's statement to the police concerning what Reese had told him about Lambert's role in the crime.

Third, Appellant complains that the prosecutor totally misstated the testimony of a witness, Richard DeLoach.

On numerous occasions we have held that a prosecuting attorney is forbidden to inject into evidence highly prejudicial personal opinions of a defendant's credibility on the grounds that it encroaches on the jury's exclusive function of weighing the evidence. The determination of guilt must be compelled intellectually from a disinterested and fair assessment of the evidence. In particular, we have struck hard at prosecutorial labelling of accused as "cold blooded killers." *Commonwealth v. Gilman*, 470 Pa. 179, 188–192, 368 A.2d 253, 257–259 (1977) (collecting cases and incorporating both our Code of Professional Responsibility and ABA Standards).

On this evidence, nevertheless, we cannot hold that the first statement violated these rules. Explanatory references to plea bargains are commonplace and acceptable. The reference to "2 more killers on the street" was part of

the explanation for the need to plea bargain with Jackson and, in any event, lacks the quality of directness towards the Appellant. Such remarks "must be evaluated in the context in which they occurred," *Commonwealth v. Smith,* 490 Pa. 380, 388, 416 A.2d 986, 989 (1980), and must rise to the level of unfairness or undue prejudice. *Commonwealth v. Carpenter,* 511 Pa. 429, 515 A.2d 531 (1986).[10]

■ Appellant's second argument that the prosecutor's closing remarks violated the *Bruton* rule is equally devoid of any merit. The interpretation of the meaning of this statement is pure speculation by the Appellant and an invitation to us to read the jury's collective mind in a factual vacuum. We decline to enter that sophist world.

■ Finally, the prosecution did not misstate witness DeLoach's testimony. The prosecutor's closing statement regarding this evidence is as follows (at T.T., April 23, 1984, p. 211):

Now, Mister Irwin in his closing told you that Mister DeLoach had testified that the person who got shot was towering over the shooter. Well, I submit to you ladies and gentlemen I don't recollect that evidence. It's up to you whether you remember that or not but—

MR. IRWIN: That's objected to.

THE COURT: Objection noted on the record.

The evidence of "towering over" was part of the effort to establish the height of the true killer by contrasting the heights of Reese and Lambert.

10. Accord is *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974):

While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

94 S.Ct. at 1873.

We point out also that this was a pitched trial marked by heat-of-battle incidents and remarks between contending attorneys: "faggot," "baby," "Nazi," and other epithets. See, for example, T.T., April 13, 1984, pp. 91–97, and April 25, 1984, p. 48.

Appellant's present allegation is that by denying in front of the jury that witness DeLoach had given such a description, the prosecution engaged in misleading the fact-finder. A review of DeLoach's testimony, nevertheless, reveals no references to who "towered over" whom. DeLoach stated simply that he could not identify the shooter who was shorter than he (T.T., April 11, 1984, pp. 167, 171), but the phrase "towering over him" instead was used solely by defense counsel. (T.T., April 23, 1984, p. 112: "He was standing straight and the victim fell on top of him and was towering over him." "He" referred to the shooter.) We determine that there was no misstatement of the trial testimony by the prosecutor because DeLoach never made such statement in the first instance.

## X. *After–Discovered Evidence*

Appellant alleges error in Judge Geisz's refusal to grant an evidentiary hearing on the purported after-discovered evidence of Jackson's statement to defense counsel (as stated in counsel's motion) in which "he indicated that he forgot to tell the jury that Bruce Reese told him that he was the one who handed the barmaid, Janet Ryan, the bag and asked her for the money in Prince's Lounge."

At the outset, we take note of the fact that the statements attributed to Jackson are stated in counsel's own motion language, not Jackson's words in his purported affidavit. (Copies of the motion, the unsigned affidavit, and Judge Geisz's order are attached to Appellant's brief.) The trial court was correct in rejecting unsworn statements. More to the point, however, is our rule that after-discovered evidence forms the basis of a new trial only if: (1) it could not have been obtained at or prior to the conclusion of the trial through due diligence; (2) it is not merely corroborative or cumulative; (3) it will not be used for the sole purpose of impeaching the credibility of a witness; and (4) it will likely result in a different verdict if a new trial were held. *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). Clearly this evidence could have been

discovered much earlier with due diligence. Our prior rulings also look with much disfavor on post-verdict testimony of jailed accomplices whose sentences have been imposed by the court. *Commonwealth v. Trefetz,* 465 Pa. 614, 351 A.2d 265 (1976), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2658, 49 L.Ed.2d 392 (1976). Lastly, even if the evidence were used, it merely would contradict the testimony of witness, Sarah Clark, that she, not Janet Ryan, was asked for the money. There was no error here.

 Finally, under our statutory duty to review death cases to determine whether the imposed sentence of death is "excessive or disproportionate to the penalty imposed in similar cases," according to 42 Pa.C.S. § 9711(h)(3)(iii), we have conducted an evaluation of all convictions of murder of the first degree prosecuted under the Act of September 13, 1978, P.L. 756, No. 141, 42 Pa.C.S. § 9711. We have reviewed the data and information pertaining to similar cases that have been compiled by the Administrative Office of Pennsylvania Courts (AOPC) pursuant to this Court's directive as enumerated in *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984). We find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, 42 Pa.C.S. § 9711(h)(3)(iii). We also find that the evidence supports the finding of an aggravating circumstance specified in subsection (d), 42 Pa.C.S. § 9711(h)(3)(ii), and that the sentences were not the product of passion, prejudice or any other arbitrary factor, 42 Pa.C.S. § 9711(h)(3)(i).

For the foregoing reasons, we uphold the convictions and affirm the sentence of death based on the conviction for murder of the first degree and the sentence of imprisonment for possession of an instrument of crime.[11]

LARSEN, J., did not participate in the consideration or decision of this matter.

11. The Prothonotary of the Eastern District is directed to transmit the full and complete record of the trial, sentencing hearing, imposition

STOUT, Former J., did not participate in the decision of this matter.

NIX, C.J., files a dissenting opinion in which ZAPPALA, J., joins.

NIX, Chief Justice, dissenting.

I dissent. While I am in complete accord with the majority's conclusion that the evidence produced by the Commonwealth meets the prescribed standard for sufficiency under *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), and would support the verdicts returned, I disagree with the majority's position that the trial judge's decision to keep the two defendants joined was not an abuse of discretion. I believe that a review of the record supports appellant's contention that the denial of the requested severance was improper in view of the fact that his position and that of his co-defendant were clearly antagonistic.

Under our procedural rules, defendants may be tried together, even if they are charged in separate informations, if they are alleged to have participated in the same act constituting a criminal offense. Pa.R.Crim.P. 1127(A)(2). Our rules further provide that a court may order separate trials if it appears that any party may be prejudiced by being tried with a co-defendant. Pa.R.Crim.P. 1128. The decision of the trial court whether to sever a case against the co-defendant for purposes of trial is one within that court's sound discretion. *Commonwealth v. Tolassi,* 489 Pa. 41, 413 A.2d 1003 (1980); *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied,* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954). Such a decision will be reversed only where there has been a manifest abuse of that discretion. *Commonwealth v. Morales,* 508 Pa. 51, 494 A.2d 367 (1985); *Commonwealth v. Morris,* 493 Pa. 164, 425 A.2d 715 (1981); *Commonwealth v. Iacino,* 490 Pa. 119, 415 A.2d 61 (1980). The critical factor in this analysis is the prejudice which inures to the accused as a result of

of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

being tried together with the co-defendant. *Commonwealth v. Tolassi, supra; Commonwealth v. Peterson,* 453 Pa. 187, 194, 307 A.2d 264 (1973). Where a party can show that he will be prejudiced by a joint trial, severance is proper. *Commonwealth v. Patterson,* 519 Pa. 190, 546 A.2d 596 (1988).

The antagonistic posture of the two co-defendants in this trial cannot be questioned. While the pre-trial antagonism may not have been sufficient to warrant a severance of the defendants, it is clear that once it became apparent that the defenses to be used surpassed mere "fingerpointing" and were on a "collision course" with each other, the trial judge should have ordered severance pursuant to Rule 1128 and heard the cases separately. *See generally, United States v. Talavera,* 668 F.2d 625, *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); *United States v. Felton,* 592 F.Supp. 172 (1984), reversed in part on other grounds, 753 F.2d 276 (1985); *Commonwealth v. Bennie,* 352 Pa.Super. 558, 508 A.2d 1211 (1986); *Commonwealth v. Orlowski,* 332 Pa.Super. 600, 481 A.2d 952 (1984).

Greatly prejudicial to appellant's case was his inability to develop his defense that the robbery-murder at Prince's Lounge was accomplished by co-defendant Reese together with key witness Bernard Jackson. Jackson made a statement to the police listing a number of robberies that he asserted had been committed with Reese. Appellant sought to elicit testimony to establish that the Prince Lounge robbery was committed by Reese and Jackson. Pursuing this objective, appellant sought to have Jackson's statement introduced to establish a plan, scheme, and design wherein Jackson and Reese would, together, commit crimes in which appellant was not involved. It was appellant's position that the jury could conclude from this statement that the series of crimes committed by Jackson and Reese would indicate a common plan, scheme and design which would strongly suggest appellant was not a party to the crime in question. This, it was argued, would have been especially compelling since appellant Lambert had only known Reese and Jackson

for a few hours prior to the commission of the crime in question. The trial judge rejected this theory, as he had never heard of it being used by a defendant, and redacted the statement to exclude any mention of thirteen robberies not involved in the immediate trial.

Without redaction, had appellant and his co-defendant been tried separately, appellant could have fully cross-examined Jackson to attack his credibility and to attempt to establish the common plan, scheme and design with Reese. Although such theories are usually employed by the prosecution, there appears to be no reason for the trial court to prevent appellant from utilizing it in a separate trial. *Commonwealth v. Schwartz*, 445 Pa. 515, 285 A.2d 154 (1971).[1]

The second instance of prejudice which necessitated a severance was the admission into evidence of an eyewitness identification by a Ms. Ryan, which was permitted to be introduced as part of co-defendant Reeses' defense. Ironically, when called as a witness on behalf of the Commonwealth, Ms. Ryan was unable to recall or identify the participants. However, once called to the stand as a witness for co-defendant Reese, she was able to identify appellant Lambert as "the shooter."[2]

In *Commonwealth v. Morales, supra*, in expressly upholding the trial court's use of its discretion in denying the appellant's motion to sever his trial from that of his co-

1. In that case, a co-conspirator attempted to offer testimony to establish the common plan, scheme and design of the other. That testimony was excluded for lack of probative value. However, the court seemed to recognize the availability of such a theory to the co-conspirator as well as the Commonwealth. *Commonwealth v. Schwartz*, 445 Pa. 515, 521–523, 285 A.2d 154, 158 (1971).

2. I have serious doubts that with regard to an event as outrageous as a double shooting, an immediate witness can at once claim no recollection whatsoever and then suddenly be able to competently identify the individual responsible for the shooting. Furthermore, it is interesting to note that sometime after the trial, Jackson had allegedly signed an affidavit stating that co-defendant Reese was "the shooter" and that the vacillating witness Ryan was a friend of the Reese family and would never testify against him. Accordingly, defense counsel requested an evidentiary hearing on after-discovered evidence. This motion, however, was denied by the trial judge as not timely filed.

defendant, we stated: "[t]he evidence against appellant was *virtually identical* to the evidence against co-defendant, and the Commonwealth's case against one defendant exactly the same as against the other." 508 Pa. 51, 61–62, 494 A.2d 367, 372 (1985) (emphasis added). As the record in this matter clearly indicates, the exact opposite situation to *Morales* exists here. The crucial identification of appellant as "the shooter" did not similarly identify the co-defendant. Additionally, it was the co-defendant, in his own defense, who procured the damaging identification of appellant. Therefore, the Commonwealth's case against both appellant and co-defendant became drastically different once the co-defendant became a prosecutorial tool, and severance should have been allowed.

The Commonwealth's case-in-chief against appellant was principally dependent upon the testimony of the tainted source, Jackson, to establish appellant's participation in the robbery-murders. That alone provided some concern over severance.[3] *See supra* note 2. It was not until the evidence presented by co-defendant Reese, Ms. Ryan's identification of appellant as one of the participants, that the requested need for severance arose. There can be little question that the identification supplied by Ms. Ryan was much more persuasive to the jury than the testimony supplied from a tainted source such as Mr. Jackson. When Reese was permitted to call Ms. Ryan as an identification witness, the Commonwealth and Reese became joint prosecutors of appellant. It is just such prejudice that makes severance necessary. As the court in *Morales* explained in further justifying its denial of the requested severance, "[i]n the instant case not only does appellant fail to indicate the manner in which his defense conflicted with co-defendants', the record does not support an inference that he was hindered in any way from presenting whatever defense he wished to present." 508 Pa. at 62, 494 A.2d at 373. In the

3. As indicated earlier, cross-examination of Jackson was limited because of the presence of co-defendant Reese. Therefore appellant could not fully cross-examine the prosecution's "star" witness, a prejudicial obstacle when appellant was facing a possible sentence of death.

instant matter the inherent testimonial conflict and procedural impediment prejudicial to appellant's defense were both obvious and objected to. Thus, pursuant to *Morales,* severance should not have been denied.

The conflict involved is undeniably clear as the procedure applied evolved into a situation where the co-defendant, rather than the prosecution, sought to establish appellant's role as the shooter. Moreover, this illustrates the anomalous roles of the parties in this case. Once appellant suffered implication at the hand of his co-defendant, the judge's subsequent ruling, that the statement offered by appellant evincing a common scheme between Jackson and Reese to commit crime was too prejudicial to the co-defendant to be admitted, denied appellant the use of exculpatory evidence which would have been available had severance been allowed.

Finally, the prejudice resulting from the trial court's refusal to sever the defendants' trials is most graphically demonstrated during the penalty phase. The evidence which provided the jury with a basis for returning the sentence of death for appellant and the lesser sentence of life imprisonment for the co-defendant resulted from the same evidence elicited by the co-defendant and *not* the Commonwealth, despite the Commonwealth's own evidence strongly suggesting that the *co-defendant* was the principal participant.

It is clear from these two instances of obvious prejudice that severance was both necessary and appropriate in this case and that the trial judge's decision to keep the two defendants joined was an abuse of discretion. For these reasons, I would reverse the decision of the lower court and grant the appellant's request for a new trial.

ZAPPALA, J., joins this dissenting opinion.