613 A.2d 12

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Demetrius CULL, Appellee.**

Superior Court of Pennsylvania.

Argued March 12, 1992.

Filed Aug. 11, 1992.

24

Karen A. Brancheau, Asst. Dist. Atty., Philadelphia, for Com., appellant.

Jules Epstein, Philadelphia, for appellee.

Before WIEAND, TAMILIA and CERCONE, JJ.

WIEAND, Judge:

After Demetrius Cull had been tried by jury and found guilty of first degree murder, criminal conspiracy and posses-

sion of an instrument of crime, the trial court granted a defense motion for new trial. Relying upon the decision of the United States Supreme Court in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the trial court held that defense counsel had been ineffective for failing to move pre-trial or at trial to redact or exclude statements of a co-defendant which implicated Cull in the offenses with which he had been charged. The Commonwealth has appealed. It contends that the statements made by the co-defendant were admissible pursuant to the co-conspirator exception to the hearsay rule and that objections by defense counsel, therefore, would have been unsupportable.

Cull and his co-defendant, Anthony Smith, were tried jointly before a jury, and both were found guilty of first degree murder, criminal conspiracy and possession of an instrument of crime on evidence summarized by the trial court as follows:

[O]n September 13, 1988, the body of Sharon Smith was found in the basement of 248 North Wanamaker Street, a rowhouse located in the City of Philadelphia. The decedent had been shot once in the head with a .32 caliber Smith and Wesson bullet.

On Saturday, September 10, 1988, at approximately 8:00 a.m., Deborah Coleman, who lived in the rowhouse next door to 248 North Wanamaker Street, [had] heard sounds of a scuffle and an argument coming from 248 North Wanamaker Street. Ms. Coleman testified that she [had] heard sounds of a physical struggle on both the first and second floor of the house, with several male voices and a female voice arguing, and that she [had] heard the female voice scream, "Help me, help me, please." Shortly thereafter the noises from next door [had] stopped abruptly.

Ms. Coleman identified both the defendant, Demetrius Cull, and co-defendant, Anthony Smith, as residents of the 248 North Wanamaker Street rowhouse. Several witnesses testified that co-defendant Smith sold "crack" cocaine from the rowhouse, while the defendant often acted as a lookout for police.

Both the defendant and co-defendant Smith were observed leaving 248 North Wanamaker Street between 8:00 a.m. and 8:30 a.m. that morning by a neighbor. Shortly thereafter, the co-defendants drove to the 100 block of Wanamaker Street, where they spoke to Faye Cherry, co-defendant Smith's former girlfriend.

Co-defendant Smith told Faye Cherry that "we just shot this fiend in the head and left her in the basement." Smith told Cherry that Sharon Smith was killed "because we wouldn't give her no drugs and she threatened to call the cops." [Smith also] told Cherry not to tell anyone that she knew him if she was questioned, and also said he was leaving town.

About 30 minutes later, the co-defendant Smith telephoned Fitzroy Lewis (also known as "Mark" or "Shorty"), who had been one of Smith's drug suppliers. In that conversation, Anthony Smith stated that he [had] directed the defendant, Demetrius Cull, to shoot the decedent. Anthony Smith said he was leaving for New York, and telephoned Lewis several days later to say that he was in New York, but would soon be heading south.

Several weeks before the murder of Sharon Smith, Anthony Smith told Lewis that he had purchased a .32 caliber gun. The night before the murder, defendant Demetrius Cull was observed firing a gun into the air outside 248 North Wanamaker Street. Several spent cartridges consistent with the bullet which killed Sharon Smith were found inside 248 North Wanamaker Street.

The medical examiner conducted an autopsy, which revealed that the decedent [had been] struck by a single bullet in the left side of her head, which [had] pierced the skull and entered the brain. The medical examiner testified that the cause of death, to a reasonable degree of medical certainty, was the gunshot wound to the head.

On January 25, 1989, the defendant was arrested in Columbia, South Carolina, and was returned to Philadelphia on January 26, 1989.

The standard we employ to evaluate claims of ineffective assistance of counsel has been stated by the Pennsylvania Supreme Court in the following manner:

The threshold inquiry in such claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). If this threshold is met, it must next be established that the particular course chosen by counsel had no reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). Finally, we require that the defendant establish how counsel's commission or omission prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

*Commonwealth v. Durst*, 522 Pa. 2, 4–5, 559 A.2d 504, 505 (1989). See also: *Commonwealth v. Rollins*, 525 Pa. 335, 344, 580 A.2d 744, 748 (1990); *Commonwealth v. Davis*, 518 Pa. 77, 83, 541 A.2d 315, 318 (1988). To establish prejudice under this standard "requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). See: *Commonwealth v. Pierce*, 515 Pa. 153, 157–158, 527 A.2d 973, 974–975 (1987); *Commonwealth v. Gainer*, 397 Pa.Super. 348, 352, 580 A.2d 333, 335 (1990) (en banc).

In *Bruton v. United States, supra,* the Supreme Court held that in a joint trial the admission into evidence of a confession by a co-defendant which inculpates the defendant violates the defendant's constitutional right to confront adverse witnesses under the Sixth Amendment to the United States Constitution. However, statements made by a co-conspirator during the course of a conspiracy are generally held to be admissible against another co-conspirator. "A well-established exception to the hearsay rule permits the out-of-court declarations of one co-conspirator to be admitted against another co-conspirator provided that the declarations [are] made during the

conspiracy and in furtherance of the common design." *Commonwealth v. Coccioletti*, 493 Pa. 103, 111, 425 A.2d 387, 391 (1981). See also: *Commonwealth v. Lambert*, 529 Pa. 320, 334–335, 603 A.2d 568, 575 (1992); *Commonwealth v. Dreibelbis*, 493 Pa. 466, 475, 426 A.2d 1111, 1115 (1981); *Commonwealth v. Moyers*, 391 Pa.Super. 262, 267, 570 A.2d 1323, 1326 (1990).

■  The interplay between the rule announced in *Bruton* and the co-conspirator exception to the hearsay rule was discussed by the Pennsylvania Supreme Court in *Commonwealth v. Coccioletti, supra*. The Court there said:

> [I]n *Bruton*, the co-defendant's out of court confession was inadmissible because it violated the hearsay rule of evidence. *Id.* at 128 n. 3, 88 S.Ct. at 1623 n. 3. The Court expressly reserved judgment about cases where the co-defendant's confession would be admissible under some exception to the hearsay rule. *Id.* at 128 n. 3, 88 S.Ct. at 1623 n. 3.
>
> . . . .
>
> In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), a criminal case originating in the State of Georgia, the U.S. Supreme Court held that an out of court declaration by a co-conspirator which implicated the defendant was admissible and the defendant's Sixth Amendment rights were not violated even though the co-conspirator did not take the stand. Unlike the *Bruton* case where no hearsay exception existed, the declarations were admitted in a Georgia Court under the co-conspirator exception to the hearsay rule.
>
> In *Dutton*, the U.S. Supreme Court refused to equate the hearsay rule with the Sixth Amendment confrontation clause, i.e., even though a statement may come within an exception to the hearsay rule, it must still be tested against the confrontation clause. The Court held that the confrontation clause was not violated whenever the declarations had strong "indicia of reliability". *Id.* at 89, 91 S.Ct. at 220. These "indicia of reliability" satisfied the Sixth Amendment confrontation clause policy of "practical concern for the

accuracy of the truth-determining process in criminal trials
..." *Id.* at 89, 91 S.Ct. at 220.

*Id.* 493 Pa. at 111–112, 425 A.2d at 391. Generally, sufficient
"indicia of reliability" to pass muster under the confrontation
clause "can be inferred without more in a case where the
evidence falls within a firmly rooted hearsay exception." *Idaho v. Wright,* 497 U.S. 805, 810, 110 S.Ct. 3139, 3146, 111
L.Ed.2d 638, 652 (1990). See also: *Bourjaily v. United
States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 2782–2783, 97
L.Ed.2d 144, 157–158 (1987); *Ohio v. Roberts,* 448 U.S. 56, 66,
100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980); *Commonwealth v. Watson,* 355 Pa.Super. 160, 166, 512 A.2d 1261, 1264
(1986). We conclude, therefore, that *Bruton* is not applicable
to exclude out of court statements by a co-defendant which are
admissible under the co-conspirator exception to the hearsay
rule.

■ The statements of appellee's co-defendant, which the
trial court determined to be in violation of the *Bruton* rule,
were heard by the jury primarily via testimony of Commonwealth witnesses Faye Cherry and Fitzroy Lewis. Cherry,
who was a former girlfriend of Smith, testified that at about
8:30 a.m. on September 10, 1988, approximately one-half hour
after the murder, Cull and Smith arrived at her home via taxi.
She testified that the following then occurred:

And they came up in it and Daheem [Smith] got out and
told me if anybody came around looking for him, I did not
know him. And I asked him why and he said, "Because we
just shot this fiend in the head and left her in the basement." And I asked him why and he told me, "Because we
wouldn't give her no drugs and she threatened to call the
cops." Then after that Demetrius came out and he said, "I
shot—" he said, "I shot the bitch because she scratched me
in my face." And I asked him why and he was like,
"Because she scratched me in my face." And then Daheem
asked me did I have any pictures of him and I said no.
Then he said, "Well, what's your phone number, so I can
call you and find out what's going on down here." And I
didn't give him the phone number. And then after that he

said, "I love you." Got in the car and they left and that was the last time I saw him.

Fitzroy Lewis, who was a drug supplier to the crack house operated by Cull and Smith, testified to a telephone conversation which he had had with Smith approximately an hour after the murder. He testified that Smith told him that he and Cull had just killed a girl and that Cull had been the one who had pulled the trigger after Smith told him to do so. According to Lewis, Smith related that he and Cull had attempted to clean up and remove their belongings from the house following the shooting.

The Commonwealth contends that these statements by Smith were made to Cherry and Lewis in an effort to elicit help in covering up the crime and in effecting an escape. Because the conspiracy continued after the murder had been committed and continued while Smith and Cull attempted to hide their crime and escape prosecution, the Commonwealth contends, Smith's statements were made while the conspiracy continued to exist.

With regard to the scope and duration of a conspiracy for purposes of applying the co-conspirator exception to the hearsay rule, the Pennsylvania Supreme Court has said:

In *Commonwealth v. Pass*, 468 Pa. 36, 360 A.2d 167 (1976), this Court specifically addressed the question of whether attempts by a co-conspirator to conceal evidence after the commission of a crime come within the scope of the conspiracy to commit the crime. Therein we adopted the following passage from *United States v. Hickey*, 360 F.2d 127, 141 (7th Cir.1966) *cert. denied*, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966), which interpreted the decision of the United States Supreme Court in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957):

"The duration of a conspiracy depends upon the facts of the particular case, that is, it depends upon the scope of the agreement entered into by its members. Generally, the conspiracy ends when its principal objective is accomplished because no agreement to retain secrecy after the achievement of the unlawful end can be shown or implied

by mere 'acts of covering up.' Thus in *Grunewald v. United States, supra,* 353 U.S. at 402, 77 S.Ct. at 972, the Supreme Court stated, 'Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators.' But the fact that the 'central objective' of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such an agreement may reasonably be inferred, the conspiracy may be found to continue. *Atkins v. United States,* 307 F.2d 937, 940 (9th Cir.1962); cf., *United States v. Allegretti,* 340 F.2d 254, 256 (7th Cir.1964), *cert. denied,* 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965). . . . The crucial factor is the necessity for some showing that the later activities were part of the original plan."

*Commonwealth v. Pass, supra* at 45–46, 360 A.2d at 171. *Commonwealth v. Evans,* 489 Pa. 85, 92–93, 413 A.2d 1025, 1028–1029 (1980) (footnote omitted). See also: *Commonwealth v. Chester,* 526 Pa. 578, 593–594, 587 A.2d 1367, 1374–1375 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 152 and 422, 116 L.Ed.2d 117 and 442 (1991); *Commonwealth v. Haag,* 522 Pa. 388, 401–402, 562 A.2d 289, 296 (1989); *Commonwealth v. Watson, supra* at 165, 512 A.2d at 1264; *Commonwealth v. Basile,* 312 Pa.Super. 206, 213–215, 458 A.2d 587, 590–591 (1983); *Commonwealth v. Tumminello,* 292 Pa.Super. 381, 389–390, 437 A.2d 435, 439–440 (1981).

After careful examination, we conclude that the conspiracy between Smith and appellee continued after the commission of the murder and included their joint efforts to conceal the crime and flee from prosecution. Thus, when Smith told Cherry, his former girlfriend, to deny knowing him, this was in furtherance of the efforts of Smith and Cull to avoid prosecution for their crime. Similarly, when Smith spoke by

telephone to Lewis, the drug supplier, an hour after the crime, the conspiracy was also continuing. Indeed, when Smith spoke with Lewis, he spoke of his and Cull's efforts to cover up the crime, and he solicited Lewis's help in finding a hotel where he and Cull could hide out until nightfall. Therefore, this conversation was also in furtherance of the conspiracy.

■ The trial court held that even if Smith's statements to Lewis were made during the continuation of the conspiracy and in pursuance of its goals, they were inadmissible because there was no evidence that Cull was present or heard this conversation. This reasoning added an unnecessary requirement for the admission of a co-conspirator's statements. " 'The declarations or acts of one co-conspirator made to third parties in the absence of his co-conspirator are admissible in evidence against *both* provided that such declarations [or acts] were made during the conspiracy and in furtherance of the common design.' " *Commonwealth v. Porter,* 449 Pa. 153, 161, 295 A.2d 311, 314 (1972), quoting *Commonwealth v. Ellsworth,* 409 Pa. 505, 509, 187 A.2d 640, 642 (1963). See also: *Commonwealth v. Evans, supra,* 489 Pa. at 92, 413 A.2d at 1028; *Commonwealth v. Moyers, supra,* 391 Pa.Superior Ct. at 269, 570 A.2d at 1326–1327.

■ While Faye Cherry was being cross-examined by counsel for co-defendant Smith, she testified to a telephone conversation with Smith about a month and a half after the murder in which Smith said that he had been merely a bystander and that the killing had been committed by Cull. This statement was not admissible under the co-conspirator exception to the hearsay rule, and it should not have been received. There was no evidence that the conspiracy had been continuing at that time or that Smith's statements had been made in furtherance of a common design. They were, rather, an attempt to shift the blame for the killing to Cull. This was the kind of statement which *Bruton* was intended to exclude. Therefore, counsel should have acted to exclude the witness's testimony.

■ Inasmuch as the other statements were admissible and because the evidence of Cull's guilt was overwhelming, however, we conclude that the information improperly elicited dur-

ing cross-examination of Cherry was not prejudicial. As such, it was an inadequate reason for granting a new trial. Not only was there evidence placing Cull at the scene of the crime, but his own admissions implicated him in the murder. Thus, counsel's failure to object to the statement made by Smith a month and a half after the killing did not require the granting of a new trial.

The trial court further determined that trial counsel's representation of appellee was deficient with respect to the testimony of Detective Franklin McGuoirk who was permitted to describe a prior consistent statement made by Commonwealth witness Fitzroy Lewis. Essentially, the prior statement related by McGuoirk was identical to Lewis's own trial testimony describing the telephone conversation that he had had with co-defendant Smith shortly after the murder. With respect to McGuoirk's testimony, trial counsel objected and requested that any references to appellee's participation in the crimes be redacted from the detective's testimony. When the detective subsequently referred to appellee in his testimony, trial counsel moved for a mistrial, which the trial court denied. Hence, we do not find that counsel was ineffective for failing to object to or request redaction of Detective McGuoirk's testimony. The record discloses that counsel, in fact, took those actions. The testimony, moreover and in any event, did not violate the teaching of *Bruton*.

For these reasons, we conclude that the trial court's award of a new trial was erroneous and must be reversed.

Reversed and remanded for consideration of the remaining issues raised in appellee's post-trial motions. Jurisdiction Relinquished.