**Commonwealth v. Sampson**

130

C.P. of Lehigh County, No. CR-1082-2011.

*Charles Gallagher*, for Commonwealth.
*Kimberly Makoul*, for defendant.

STEINBERG, *J.*, January 9, 2013—On November 21, 2011, the appellant, Isaah Sampson, was found guilty after a jury trial of Robbery[1] (three counts), Attempted Criminal Homicide,[2] Aggravated Assault[3] (two counts), and Criminal Conspiracy to Commit Robbery.[4] The appellant and two confederates, Hishamu Curry and Edward Maye, robbed the KNBT Bank in Emmaus at gunpoint. During the robbery, Edward Maye assaulted the assistant manager of the bank with a firearm, and in their flight to avoid apprehension, the appellant, Isaah Sampson, fired his weapon multiple times at Officer

1. 18 Pa.C.S. § 3701(a)(1)(ii).
2. 18 Pa.C.S. §2501, §901.
3. 18 Pa.C.S. §2702(a)(1), (2).
4. 18 Pa.C.S. §3701(a)(1)(ii), §903.

William Bryfogle of the Emmaus Police Department. Multiple bullets struck Officer Bryfogle's cruiser, but he escaped uninjured.

A presentence report was ordered following the jury's verdict. A full sentencing hearing was held on April 16, 2012, during which both the presentence report and the Sentencing Guidelines were considered prior to imposing sentence. At the conclusion of the sentencing hearing, the appellant received a total sentence of not less than thirty-three (33) years nor more than seventy (70) years in a state correctional institution.[5]

Trial counsel requested that counsel be appointed to represent the appellant for appeal purposes, and this court did so on May 8, 2012. Prior to doing so, the appellant filed a pro se "defendant's notice of appeal" which this court treated as a request for post-sentence relief pursuant to Pa.R.Crim.P. 720.[6] Following the

---

5. The appellant received three (3) concurrent sentences of not less than ten (10) years nor more than twenty (20) years for the three (3) counts of Robbery. He also received a consecutive sentence of not less than ten (10) years nor more than twenty (20) years for the Attempted Homicide and Aggravated Assault charges pertaining to Officer Bryfogle. Both of those charges were imposed concurrently with each other. He also received a consecutive sentence of not less than three (3) years nor more than ten (10) years for the Aggravated Assault charge involving Michelle Andrews, the Assistant Bank Manager. Finally, the appellant received a consecutive sentence of not less than ten (10) years nor more than twenty (20) years for the charge of Criminal Conspiracy to Commit Robbery. Notes of Testimony, Sentencing (hereinafter N.T.S.), pp. 43-46.

6. The appellant filed his pro se motion on May 1, 2012, which is technically beyond the ten (10) day time limit in Pa.R.Crim.P. 720(A). However, the post-mark on the envelope was dated April 24, 2012, and pursuant to the "prisoner mailbox rule", it was a timely filed post-sentence motion. *See Commonwealth v. Chambers*, 35 A.3d 34, 38-39 (Pa. Super. 2011) quoting *Commonwealth v. Jones*, 700 A.2d 423, 425 (Pa. 1997). Due to the appointment of new counsel, and the lack of prejudice to the appellant by doing so, the pro se document was treated as a post-sentence motion. It was also unclear from appellant's motion whether he was requesting action pursuant to Pa.R.Crim.P. 720(A)(1) or 720(A)(3).

appointment of counsel, those motions remained undecided until the notes of testimony from the trial and related proceedings were transcribed, and new counsel considered filing a "supplemental post-sentence motion" pursuant to Pa.R.Crim.P. 720(B)(1)(b). On August 6, 2012, new counsel's request for an extension pursuant to Pa.R.Crim.P. 720(B)(3)(b) was granted, and the post-sentence motion remained unresolved. Thereafter, the post-sentence motions were denied by "operation of law" pursuant to Pa.R.Crim.P. 720(B)(3)(b),(c). On October 4, 2012, a notice of appeal was filed by counsel.[7] Pursuant to this court's directive, counsel filed a Pa.R.Crim.P. 1925(b) statement. It is alleged that the evidence was insufficient to sustain the verdict, the verdict was against the weight of the evidence, and that it was error to permit the introduction into evidence of cell phone records and text messages secured from the cell phone found in the possession of Hishamu Curry, a co-conspirator.[8]

## Background

On December 30, 2010, at approximately 9:15 a.m., three (3) masked men with guns entered the KNBT Bank in Emmaus and exclaimed, "this is a robbery".[9] Two (2) of the three (3) jumped on the counter, and the third robber grabbed Michelle Andrews, the Assistant Manager, and

---

7. On November 21, 2012, the Clerk of Judicial Records denied the post-sentence motion, and technically pursuant to Pa.R.Crim.P. 720(A)(2)(b), counsel had thirty (30) days from that date to file a Notice of appeal. However, counsel filed the appeal within thirty (30) days after the 120 day deadline with the thirty (30) day extension expired. (approximately September 24, 2012).

8. Sanyo Model SCP 2700. Notes of Testimony, Trial (hereinafter N.T.T.), 11/17/11, p. 266.

9. N.T.T., 11/16/11, pp.25, 50.

forced her to the vault at gunpoint.[10] When she reached the vault, he struck her in the head with his gun. Ms. Andrews fell to the floor, and then grabbed her sweater to stem the blood coming from her head.[11] Ms. Andrews called-out for someone to open the vault, and Josephine Baba and Donna Grenauer, two (2) bank tellers, immediately responded. Both were unable to open the vault, and with that, one (1) or more of the robbers threatened: "Two more seconds and I'm going to start shooting if we don't get the vault open."[12] Finally, Ms. Baba was able to open the vault, but by then the robbers had fled from the bank.[13]

Minutes earlier, Ms. Grenauer was confronted at her teller station by one (1) of the robbers who was wearing a ski mask and hooded sweatshirt, and was carrying a duffle bag. He demanded that she put money in the bag and when she did not do so as quickly as he wanted, "he jumped on the counter and helped himself into the drawer and took money out himself."[14] Various denominations were removed, including a "pack in straps."[15] This was described as a GPS device.[16]

Kathy Moyer, who was also a teller at the bank, observed the three (3) robbers enter the bank armed with guns, and wearing masks and gloves.[17] She was confronted by one (1) of the robbers who placed a gun in her face and demanded money. This individual made it clear that he did not want

---

10. N.T.T., 11/15/11, pp. 97, 99.
11. *Id.* at pp. 99-100; N.T.T., 11/16/11, pp. 14, 17, 59.
12. *Id.* at p. 101; N.T.T., 11/16/11, pp. 39, 59.
13. N.T.T., 11/16/11, pp. 15-16.
14. *Id.* at pp. 26-27.
15. *Id.* at pp. 27-28.
16. *Id.* at pp. 27-33.
17. *Id.* at pp. 49-50, 66-67.

"strap money."[18] Ms. Moyer gave him the money from her teller drawer. She was then led to the vault at gunpoint, where she remained with her fellow employees.[19]

It was determined that eleven thousand five hundred and twenty-nine ($11,529) dollars was taken in the robbery.[20] When the getaway car was later inventoried by the police, they discovered a black bag with money, as well as a GPS tracking device, which continued to ring in the 9-1-1 center until Detective Hoats deactivated it. The "strap money" had the initials "KM", Kathy Moyer.[21]

Officer William Bryfogle of the Emmaus Police Department was approximately a mile and a half away from the bank when he received a call of suspicious activity at the bank. He activated his emergency lights and siren, which also activated his on-board video camera, and proceeded to the bank. While doing so, he received further notification "that a GPS unit had activated from the inside of the bank on a money pack."[22] Further information communicated to him indicated that the transponder was signaling it was moving out of the bank.[23]

He arrived at the bank approximately a minute or so later, and proceeded to the intersection of North 2nd Street and Green Street, which is an alley behind the bank. Initially, he did not observe any activity, but approximately ten (10) seconds later, he observed a vehicle enter the alley coming towards his patrol vehicle. The vehicle ignored the stop

18. N.T.T., 11/16/11, pp. 50, 64.
19. *Id.* at pp. 58-60.
20. *Id.* at pp. 42, 57-58.
21. N.T.T., 11/17/11, pp. 201-205.
22. N.T.T., 11/16/11, p. 83.
23. *Id.* at pp. 84, 161.

sign at 2nd and Green Street and continued eastbound. Officer Bryfogle turned his patrol vehicle behind the fleeing vehicle, and again activated his emergency lights and siren. He identified the vehicle as a blue Mercury with three (3) occupants wearing dark clothing.[24]

The pursuit was continuing when Officer Bryfogle observed a "black handgun come out the back passenger window of the vehicle and point in [his] direction."[25] "Three shots [were] fired towards the front of [his] patrol vehicle approaching Main Street."[26] His vehicle was struck by these bullets, and a subsequent examination revealed bullet holes through the bumper, the lower plastic air vent, and the driver's side front tire.[27]

Officer Bryfogle continued his pursuit, and after turning onto Main Street, the Mercury put on its brakes, almost coming to a complete stop. The passenger in the rear of the vehicle continued to fire his "black semi-automatic handgun",[28] and with that, Officer Bryfogle rammed the back of the Mercury. The Mercury began to slow, and Officer Bryfogle tried to create some distance between the two vehicles as a precautionary measure. When the Mercury reached 1st Street, the back passenger exited the vehicle, and a little further down the street, the front passenger departed. Finally, while the vehicle was still "rolling", the driver fled, and ran behind the back of the Mercury.[29]

24. *Id.* at p. 92.
25. N.T.T., 11/16/11, p. 95.
26. *Id.* at p. 96.
27. *Id.* at pp. 117-119; N.T.T., 11/18/11, pp. 177-180.
28. N.T.T., 11/16/11, pp. 97-98.
29. *Id.* at p. 99.

Officer Bryfogle, who was still in his patrol vehicle, followed the driver and bumped him with the front bumper of his patrol vehicle. Although the driver was knocked down, he jumped up, and Officer Bryfogle knocked him down a second time. Officer Bryfogle then exited his vehicle, and the driver jumped up again and began running. He continued to do so until he was struck by Sergeant Troy Schantz's patrol vehicle. All of Officer Bryfogle's testimony was captured by the on-board video from his patrol vehicle, which was introduced into evidence at trial.

Sergeant Schantz also responded to the bank, and as he approached the front of the bank, he heard communication from Officer Bryfogle that he was in pursuit of a vehicle. He also heard that shots were being fired at Officer Bryfogle. Sergeant Schantz returned to his patrol vehicle, and after making visual contact with Officer Bryfogle's vehicle, he assisted in the pursuit of the Mercury. Sergeant Schantz also observed the occupants of the Mercury flee the vehicle, and assisted Officer Bryfogle in his pursuit of two (2) of the suspects. Sergeant Schantz struck the individual described as the driver of the Mercury, which caused that individual to fly onto the hood of Sergeant Schantz's vehicle. The ski mask this individual was holding also landed on Sergeant Schantz's windshield. Sergeant Schantz then hit his brakes, which caused that individual to then hit the pavement.[30] While initially this individual seemed unconscious, he quickly regained consciousness and began fighting with Sergeant Schantz. He was subdued and handcuffed. A search of this individual revealed a Samsung, AT&T cell phone. He was identified

---

30. N.T.T., 11/16/11, pp. 175-176, 178, 190.

as Edward Maye.[31]

The front passenger, who was wearing a gray sweatshirt, scaled a fence at the Emmaus Maintenance Department garage area and disappeared.[32] During a search at the fence, a black cloth glove was found attached to the top of the fence. On the ground, directly beneath the glove, a Hi-Point .380 caliber handgun was recovered.

The back passenger, who was in dark clothing, fled "south of South 1st Street".[33] Sergeant Schantz coordinated a search for the two (2) remaining suspects, and in following the path of the back passenger, discovered a myTouch T-Mobile cell phone, and a .40 caliber Smith & Wesson handgun.[34] A firearms expert report was introduced by stipulation, and demonstrated that this was the weapon that discharged the bullets at Officer Bryfogle.

One of the responding officers was Budd Frankenfield of the Salisbury Police Department. He arrived shortly after Sergeant Schantz had Edward Maye on the ground and in custody. He received a description from Sergeant Schantz of one (1) of the fugitives, and began a search both by patrol vehicle and on foot. He eventually observed a black male wearing sweatpants and a hooded sweatshirt walk "northbound out of the tree line and [enter] the railroad tracks approximately seventy-five feet to [his] west."[35] Officer Frankenfield ordered the individual to stop, but the individual disregarded his instructions and fled in the opposite direction with Officer Frankenfield in

31. *Id.* at pp. 190, 215.
32. *Id.* at pp. 131, 170-171, 214,217-219; N.T.T., 11/17/11, p. 72.
33. N.T.T., 11/16/11, pp. 177,235-236,239.
34. N.T.T., 11/16/11, pp. 191-192, 197, 199-200, 202.
35. *Id.* at p. 254.

pursuit.[36] Sergeant Geschwindt from the Emmaus Police Department eventually got the bead on this individual and he was apprehended.[37] This individual was the appellant, Isaah Sampson.[38] However, he told Sergeant Geschwindt that his name was "Andre".[39]

At the time of his apprehension, the appellant was wearing multiple layers of "very damp clothing",[40] including a blue hoodie and blue sweatpants with the Champion logo. He also had a ski mask which was recovered from the jacket that he was wearing.[41] The ski mask was pushed up on his head when he was taken into custody, and the appellant "stuffed" it into the pocket of his coat at Emmaus Police Headquarters.[42] Still images from the bank reflect that one of the robbers was wearing a "dark in color, blue in color, Champion hooded sweatshirt".[43]

During the search of the Mercury, Detective Timothy Hoats not only discovered the black bag with the money from KNBT Bank, but also a Blackberry phone on the back seat.[44] This cell phone, as well as the Samsung AT&T seized from Edward Maye, the HTC myTouch T-Mobile cell phone discovered with one (1) of the firearms near the getaway vehicle, and the Sanyo Boost Mobile phone which was recovered from the ground where Hishamu Curry was apprehended, were analyzed by Detective

---

36. *Id.* at pp. 255-260.
37. *Id.* at pp. 259-260, 287-289.
38. *Id.*
39. *Id.* at p. 290.
40. N.T.T., 11/17/11, p. 46.
41. *Id.* at pp.58-60.
42. *Id.* at pp. 44, 60, 125.
43. N.T.T., 11/18/11, pp. 168-169.
44. N.T.T., 11/17/11, pp. 206,208.

Jason Apgar. Detective Apgar was qualified as an expert in utilizing a universal forensic extraction device referred to as a Cellbrite machine.[45] His expert testimony documented the retrieval of data from these cell phones.

Detective Apgar located "contacts and photos" on the myTouch T-Mobile cell phone. This cell phone was recovered along the path traveled by the back seat passenger. The first contact in the phone was Jenny Irrizary.[46] When the appellant was interviewed by Detective Hoats, he told the detective that he resided with his mother and his girlfriend, "Jen Irrizary".[47] Extracted from this same cell phone were also photographs of the appellant.[48] Other information was extracted from this cell phone, which linked it to the cell phone retrieved from Curry's possession when he was apprehended.[49]

The Curry cell phone was recovered at approximately 7:00 p.m. on the date of the robbery, when members of the Allentown Police Department cornered a vehicle in connection with this robbery. Lieutenant Glen Dorney testified that after this vehicle was stopped, he exited his patrol vehicle with his gun drawn, and ordered Hishamu Curry to put his hands in the air. Lieutenant Dorney approached the vehicle, opened the door, and removed Curry from the vehicle. Curry either had the cell phone on his person, inside a pocket or on his lap. As Lieutenant Dorney pulled Curry from the vehicle, the cell phone "flew out of his lap area and onto the ground."[50] FBI Agent

---

45. N.T.T., 11/17/11, pp. 244-251, 263.
46. N.T.T., 11/18/11, pp. 47-48, 51.
47. N.T.T., 11/17/11, p. 214.
48. N.T.T., 11/18/11, pp. 56-58.
49. *Id.* at p. 78.
50. *Id.* at pp. 147-148.

Alan Jones picked up the cell phone, and handed it to FBI Agent Thomas Neeson, who turned it over to Detective Apgar.[51]

When Hishamu Curry was removed from the vehicle, he was less than cooperative, necessitating the use of force to handcuff him. Once the officers were able to take control of him, he told them, "Okay, you caught me."[52]

Detective Apgar's retrieval of the text messages from the Curry cell phone demonstrated the planning of the robbery between Curry, Sampson, and Maye. In that regard, the Commonwealth utilized a composite of the three hundred and ninety-five (395) text messages retrieved from the Curry cell phone to show communications between all three (3) conspirators in the days leading up to and the day of the robbery. Additionally, Curry's text messages in his flight to avoid apprehension were also part of the composite exhibit.[53]

A review of the composite shows that number 484-560-5464[54] matches the phone number of the Samsung, which was recovered from Maye.[55] Number 484-860-8898[56] matches the phone number of the Blackberry, which was recovered from the back seat of the Mercury.[57] The myTouch cell phone, which was discovered with the Smith & Wesson handgun on the path the rear passenger

51. N.T.T., 11/18/11, pp. 22-23, 28-29.
52. N.T.T., 11/17/11, pp. 147, 151.
53. *See* Commonwealth Exhibit 67, which is attached to this opinion as Exhibit A.
54. N.T.T., 11/18/11, p. 43.
55. Commonwealth Exhibit 67, #39-#106, #152, #155-#160, #307-#320.
56. N.T.T., 11/18/11, p. 45.
57. *Id. See also* Commonwealth Exhibit 67. #151, #153-#154, #282-#289, #321-#328.

fled, not only contained a contact card with the number 484-860-8898, but again, photographs of the appellant.[58]

The one hundred and twenty-seven (127) text messages contained in Commonwealth Exhibit 67 use coded language and conversations. An example includes: "when u wanna strike a vault", to which Curry replies "where", and he in turn receives the reply "emmaus".[59] Following the robbery, Curry's conversation with "Mizzy" is less coded:

**Curry**: In a world of trouble again!

\*\*\*\*\*\*

**Mizzy**: U got me scared and my nerves r bad..I hope it aint nothin we can get u out of!!!!!

**Curry**: Hopefully not, but its bad bad bad sis!

Discussion

A. Sufficiency of the Evidence/Weight of the Evidence

The appellant's initial claims pertain to the sufficiency of the evidence and the weight of the evidence. A review of the appellant's Pa.R.A.P. 1925(b) statement fails to provide any detail regarding either of these challenges. The sufficiency claim merely alleges that the "Commonwealth failed to provide proof necessary to support a conviction of the charges."[60] The weight of the evidence allegation contains even less specific information. As a result, these

---

58. N.T.T., 11/18/11, pp. 52-59.
59. Commonwealth Exhibit 67, #41-#45.
60. 1925(b), ¶ 1.

claims are waived. *Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008)("[T]o preserve a claim that the evidence was insufficient, then the 1925(b) statement needs to specify the element or elements upon which the evidence was insufficient.").[61] The appellant's challenge to the weight of the evidence is also waived because it was not raised as required by Pa.R.Crim.P. 607. *See also Commonwealth v. Bryant*, 2012 WL 5897735, *4 (Pa. Super. November 26, 2012).

Although the appellant's claim is subject to a waiver analysis, these claims also fail on the merits. Challenges to the sufficiency of the evidence, or to the weight of the evidence, are distinct legal concepts. *Commonwealth v. Davis*, 799 A.2d 860, 864 (Pa. Super. 2002). A claim challenging the sufficiency of the evidence requires all the evidence admitted at trial to be viewed in the light most favorable to the verdict winner, who is also entitled to all reasonable inferences in its favor. *Commonwealth v. Burkett*, 830 A.2d 1034, 1037 (Pa. Super. 2003). In doing so, there must be "sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Palo*, 24 A.3d 1050, 1054 (Pa. Super. 2011) quoting *Commonwealth v. Bruce*, 916 A.2d

---

61. The appellant, in his pro se document, contends that he was a "victim of mistaken identity". Trial counsel at the close of the Commonwealth's case-in-chief made a motion for judgment of acquittal only regarding the attempted murder charge. N.T.T., 11/18/11, pp.218-220. Trial counsel's motion was denied and if considered on appeal is without merit. *See Commonwealth v. Jones*, 629 A.2d 133, 136 (Pa.Super. 1993)(A reasonable jury could infer that the lead projectile that struck officer's squad car, narrowly missing his vital organs, was intended to kill the officer); *Commonwealth v. Harris*, 169 A.2d 576 (Pa. Super. 1961)(Shots fired at officer sitting in a police car sufficient to establish intent to kill even though none of the shots struck the officer). Likewise, poor aim does not constitute a lack of malice. *Commonwealth v. Manley*, 985 A.2d 256, 272 (Pa.Super. 2009).

657, 661 (Pa. Super. 2007). However, the application of this test does not permit the evidence to be weighed nor is the judgment of the fact-finder substituted. "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Id.* at 1054-1055.

The appellant's alternative argument that the verdict is against the weight of the evidence, is addressed to the discretion of the trial court. *Commonwealth v. Chine*, 40 A.3d 1239, 1241 (Pa. Super. 2012); *Commonwealth v. Bozic*, 997 A.2d 1211, 1233 (Pa. Super. 2010). A claim of this type "concedes that there is sufficient evidence, but nevertheless contends that the trial judge should find the verdict so shocking to one's sense of justice and contrary to the evidence as to make the award of a new trial imperative." *Commonwealth v. Robinson*, 834 A.2d 1160, 1167 (Pa. Super. 2003). *See also Chine*, at *4 quoting *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003)("the evidence must be 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'"); *Commonwealth v. Lyons*, 833 A.2d 245, 258 (Pa. Super. 2003).

Trial judges, in reviewing a claim that the verdict is

against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that 'notwithstanding all of the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'

*Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000).

The appellant was apprehended within minutes after he and his confederates discarded the getaway car, and attempted to elude the authorities by foot. When he was apprehended, he was wearing clothing depicted in the bank surveillance footage, and in his possession was a ski mask. Each of the robbers was wearing masks when they entered the bank. Ms. Grenauer used the word "ski masks".

The appellant's apprehension was also not without incident. When Officer Frankenfield identified himself and told the appellant to stop, the appellant fled. He was eventually cornered by Sergeant Geschwindt and other officers. Thereafter, he complied with Sergeant Geschwindt's verbal commands to get on the ground. When asked his name, he provided the false name, "Andre".

Finally, not only were the recovered cell phones linked to each other, but also directly implicated the appellant. The myTouch T-Mobile cell phone, which was found with a firearm along the flight route of the back seat passenger, contained photographs of the appellant. Additionally, the My Contact Card in that cell phone has the appellant's

girlfriend as his first contact.[62] It also has a contact number matching the Blackberry, which was found in the backseat of the getaway car.[63]

The circumstantial evidence presented by the Commonwealth sustained its burden of proof. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011) (The Commonwealth may meet its burden of proof through the use of wholly circumstantial evidence); *Commonwealth v. Lopez*, 2012 WL 3195102, \*4 (Pa. Super. August 8, 2012) quoting *Commonwealth v. Stays*, 40 A.3d 160, 167 (Pa. Super. 2012)("[T]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence, coupled with reasonable inferences drawn therefrom, overcomes the presumption of innocence."). *See also Commonwealth v. Robertson*, 874 A.2d 1200, 1206 (Pa. Super. 2005) (Appellant linked to robbery by blood of victim on jacket found in his residence, his placement near the scene of the crime at the approximate time of the attack, his possession of money without explanation, and his statement to a witness that he should not worry or talk about the money.); *Commonwealth v. Mayo*, 496 A.2d 824, 827 (Pa. Super. 1985)(Appellant wore a mask at the time of the robbery, but the witness was able to identify appellant on the basis of size, weight, hair, clothing, build, and knife found in appellant's possession.); *Commonwealth v. Turner*, 410 A.2d 895 (Pa. Super. 1979)(The appellant was not identified by bank teller, but was captured running away from the scene of the crime a short time after robbery, with currency of the same denomination as taken in the

---

62. N.T.T., 11/18/11, pp. 47-51.
63. *Id.* at pp. 52-53, 59.

robbery by his feet and in sneakers which were on the wrong feet.).

The appellant would contend that his presence in the Borough of Emmaus shortly after the robbery was coincidental. He would argue that the location of his apprehension, which was in the direction the back seat occupant fled, wearing clothing that matched the surveillance video footage, and carrying a ski mask could have happened to anyone. He would also suggest his flight and use of a false name does not connect him to the events at the bank and its aftermath. Finally, it is his position that photographs of him in the cell phone found with the firearm used to shoot at Officer Bryfogle does not prove he had the cell phone that date. This Court disagrees.

This mountain of circumstantial evidence refutes the appellant's sufficiency and weight of the evidence claims. These various pieces of circumstantial evidence would allow a jury to find beyond a reasonable doubt that the appellant was a participant in the robbery and was the back seat passenger who fired at Officer Bryfogle. This is especially true when the evidence is viewed in the light most favorable to the Commonwealth.

Finally, it has been explained that "one of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence." *Widmer*, 744 A.2d at 753. The verdict in this case was not against the weight of the evidence. It was not "so tenuous, vague and uncertain that it shocked [this Court's] conscience". *Bozic*, 997 A.2d at 1223.

The appellant's other claim is that it was error to permit

the introduction of the text messages and cell phone records. He is apparently relying on *Commonwealth v. Koch*, 39 A.3d 996 (Pa. Super. 2011), appeal granted 44 A.3d 1147 (Pa. May 15, 2012).[64] In *Koch*, thirteen (13) drug-related text messages were transcribed from the appellant's cell phone and introduced into evidence at trial. It was argued that the text messages were not properly authenticated because there was no evidence that the appellant was the "author of the text messages, nor evidence that drug-related texts were directed to her because Commonwealth witnesses conceded that another person was using [her] phone at least some of the time." *Id.* at 1002.

Following a review of Pa.R.E. 901(a) and caselaw from both Pennsylvania and other jurisdictions, it was held that the text messages were not properly authenticated, and constituted hearsay. *Id.* at 1005. "The detective's description of how he transcribed the text messages, together with his representation that the transcription was an accurate reproduction of the text messages on Appellant's cellular phone, is insufficient for purposes of authentication where the Commonwealth concedes that Appellant did not author all of the text messages on her phone....[T]hat authentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required." *Id.*

The text messages captured from Curry's Sanyo cell phone do not present the same authentication issues raised

---

64. Motions in limine, 11/14/11, pp. 21-59; N.T.T., 11/17/11, pp. 335-339; N.T.T., 11/18/11, pp. 10-17.

in *Koch*. His authorship of most of the text messages cannot reasonably be disputed, especially in light of their content both prior to and subsequent to the robbery. The text messages provided a continuity of events leading up to the robbery of the KNBT Bank, as opposed to the drug-related text messages in *Koch*, which appear to be random and not interconnected. Additionally, the other persons, who were participants in the texting, are easily identified. Prior to the robbery, the other texting partners were either in possession of the cell phone recovered on Edward Maye, or in the getaway vehicle. Based on the evidence introduced at trial, that person was the back seat passenger, the appellant, Isaah Sampson.

Curry was also in possession of the Sanyo cell phone when he was apprehended. No testimony was presented that on the day of the robbery or the days leading up to the robbery, anyone else had possession of it. This is in sharp contrast to *Koch*, in which the Commonwealth conceded that another person used the cell phone in question. Likewise, Curry's contention at trial that the Sanyo cell phone which "flew out of [appellant's] lap" was not in his possession is directly contradicted by the circumstantial evidence related to its recovery.

This is not a case in which authorship is based solely on evidence that the text message was sent from a cell phone assigned to an individual like *Koch*. Here, as opposed to *Koch*, there are "contextual clues" in the text messages which reveal the sender. *Id.* at 1005. For example, within hours of the robbery, the text messages on the Sanyo disclose that Curry is a wanted man, and he is fully aware that the police are attempting to apprehend

him. *See Rodriguez v. State*, 273 P.3d 845, 849-850 (2012) citing *Koch* (collecting cases)(Circumstantial evidence corroborating the sender's identity may include the context or content of the messages themselves, such as where the messages contain factual information or references unique to the parties involved.).

Pa.R.E. 901 demonstrates that evidence may be authenticated in a number of ways. *In re F.P.*, 878 A.2d 91, 94 (Pa. Super. 2005) quoting *Commonwealth v. Brooks*, 508 A.2d 316, 319 (Pa. Super. 1986)("A document may be authenticated by direct proof and/or by circumstantial evidence. [P]roof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing.")(internal citations omitted). "[T]he ultimate determination of authenticity is for the jury. A proponent of a document need only present a prima facie case of *some* evidence of genuineness in order to put the issue of authenticity before the factfinders." *Brooks*, 508 A.2d at 320 (emphasis in original). In *Tienda v. State*, 358 S.W. 3d 633, 639 (Tex.Crim.App. 2012) (collecting cases), the many ways of authenticating electronic evidence was explained in pertinent part as follows:

> Text messages have all been admitted into evidence when found to be sufficiently linked to the purported author so as to justify submission to the jury for its ultimate determination of authenticity. Such prima facie authentication has taken various forms.... Sometimes the communication has contained information that only the purported sender could be expected to know. Sometimes the purported sender has responded to

an exchange of electronic communications in such a way as to indicate circumstantially that he was in fact the author of the particular communication.... And sometimes other circumstances, peculiar to the facts of the particular case, have sufficed to establish at least a prima facie showing of authentication.

*Id.* at 639-640.

Here, Curry's possession of the Sanyo cell phone, the exchange of text messages between Curry and cell phones either seized from a conspirator or the getaway car, and the substance of the text messages, all provide the threshold necessary for authentication. All of the cell phone activity between Curry and the other cell phones ends immediately prior to robbery, when presumably the three (3) conspirators are on their way to the bank together. Additionally, the absence of text messages after the robbery demonstrates the cell phones were in police custody. Finally, the text messages after the robbery with "Mizzy", whom Curry calls "sis", and an unidentified female who calls him "Moe", leave little doubt that Curry is attempting to avoid apprehension. Two (2) of the last text messages Curry received was "They kno!!!!!" and "They got my whole fam ynder survailance [sic]...u gotta bounce asap!!!"[65]

The substance of the text messages was also admissible under the co-conspirator exception to the hearsay rule. Pa.R.E. 803(25)(E)("A statement by a co-conspirator of a party during the course and in furtherance of the conspiracy"). Three (3) requirements must be established:

---

65. Commonwealth Exhibit 67, #387, #394.

(1) the prosecution must prove the existence of a conspiracy between the declarant and the defendant against whom the evidence is being offered; (2) the Commonwealth must show that the statements were made during the course of the conspiracy; and (3) the Commonwealth must show that the statements were made in furtherance of the common design. *Commonwealth v. Holton*, 906 A.2d 1246, 1251 (Pa. Super. 2006)(citations omitted) (Statements made by drug buyer were admissible under co-conspirator exception to hearsay rule.).

The circumstances of this bank robbery, i.e. three (3) masked men with guns who proceed to threaten bank employees in the course of spiriting away with over eleven thousand dollars, adequately shows the three (3) were acting in concert. The text messages from cell phones identified and seized from Curry, Maye, and the Mercury not only prove the existence of the conspiracy, but the identity of the declarants by a "fair preponderance of the evidence." *Id.* Each of the text messages precede the bank robbery and are evidence of discussions regarding their planning of the robbery. For example, the text messages describe their intentions to "strike a vault", and where it was to take place, i.e. "emmaus".[66] The text messages also discuss the possession of a getaway car and weapon, i.e. "i got a wheel u got a tool so tell me".[67] Each of these statements was made in furtherance of the common design which included what time and where the participants would meet on the day of the robbery.[68]

---

66. Commonwealth Exhibit 67, #41, #45.
67. *Id.* at #97.
68. *Id.* at #315-#328.

152

Finally, the text messages that were made after the robbery constitute admissions by Curry. *See* Rule 803(25)(A); *Commonwealth v. Edwards*, 903 A.2d 1139, 1157-1158 (Pa. 2006), *cert, denied* 127 S.Ct. 2030 (2007). In that regard, "voluntary, extrajudicial statements made by a defendant may be used against [him] although they contain no admission of guilt. *Commonwealth v. Tervalon*, 345 A.2d 671, 676 (Pa. 1975); *Commonwealth v. Jones*, 247 A.2d 624, 627 (Pa. Super. 1968)(Guilty knowledge recognized by statement "we could get in a lot of trouble over it."); *State v. Pindale*, 592 A.2d 300, 309-310 (N.J. Super. 1991)(The conduct of a defendant subsequent to the commission of a crime is relevant when the conduct in question indicates a consciousness of guilt.). Even so, Curry's attempt at evading capture was still part of the on-going conspiracy. *Commonwealth v. Chester*, 587 A.2d 1367, 1374-1375 (Pa. 1991)(Statements made after murder to third parties were properly admitted under the co-conspirator exception to hearsay rule); *see also Commonwealth v. Lambert*, 603 A.2d 568, 575 (Pa. 1992) (Statement falls within co-conspirator exception because it was part of the conspiracy dealing with flight from the scene).[69]

For all the foregoing reasons, the judgment of sentence should be affirmed.

## ORDER

---

69. It is unclear if the appellant is presenting a *Crawford v. Washington*, 541 U.S. 36 (2004) challenge. If so, similar contentions have been rejected because the text messages are not "testimonial". These text messages are also integrated with each other and provide the context for the robbery. *See U.S. v. Hendricks*, 395 F.3d 173, 184 (3d Cir. 2005); *see also U.S. v. Peak*, 2006 WL 1030226 (E.D. Pa. April 18, 2006).

And now, January 9, 2013, it appearing that the appellant has filed a notice of appeal in the above-captioned matter; it further appearing that the appellant has filed a "Concise Statement of Reasons Complained of on Appeal" pursuant to Pennsylvania Rule of Appellate Procedure 1925(b); it further appearing that our accompanying opinion satisfies the requirements of Pennsylvania Rule of Appellate Procedure 1925(a);

It is hereby ordered that the Clerk of Courts, Criminal Division, shall transmit the record in the above-captioned matter to the Superior Court forthwith;

It is further ordered that the Clerk of Courts shall include with the transmittal of the record the following documents:

1. Notes of Testimony from Pretrial Motions held June 20, 2011.

2. Notes of Testimony from Motions in Limine held November 14, 2011.

3. Notes of Testimony from the Trial held November 15, 2011 to November 19, 2011.

4. Notes of Testimony from the Sentencing held April 16, 2012.

5. A copy of the appellant's Pre-Sentence Investigation Report for review by the Superior Court, and that said report shall be sealed to preserve its confidentiality pursuant to Pa.R.Crim.P. 703.