J-S15023-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JUSTIN BROWN, | |
| Appellant | No. 1728 EDA 2014 |

Appeal from the Judgment of Sentence of May 15, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001342-2013

BEFORE:  BENDER, P.J.E., OLSON and PLATT,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 16, 2016**

Appellant, Justin Brown, appeals from a judgment of sentence entered on May 15, 2014 in the Criminal Division of the Court of Common Pleas of Philadelphia County.  We affirm.

The trial court thoroughly summarized the facts and procedural history of this case as follows:

> Sixteen-year-old Yasin Harvey was shot and killed on May 2, 2012 in a drive-by shooting in West Philadelphia.  [Appellant] and co-defendant, Elijah Fleming ("Fleming"), were arrested and charged with his murder.  From May 7-15, 2014, [Appellant] and Fleming were tried together before a jury.
>
> [At trial, Police Officer Kevin Dorin was the first witness called to testify on behalf of the Commonwealth].  Officer Dorin stated that on March 27, 2012, he responded to a report of gunshots on the 600 block of Edgemore Road.  He observed six shell casings on the scene, contacted Southwest Detectives, and then waited for them to arrive.

*Retired Senior Judge assigned to the Superior Court.

Detective Vincent Parker testified next. He stated that on March 27, 2012, he and his partner, Detective Ortiz, investigated the shooting on the 600 block of Edgemore Road. At the scene, he discovered six shell casings and two bullet projectiles. After speaking with two neighbors in the area, Detective Parker went to the hospital to speak with victim Jamal Payne ("Payne"); however, he was unable to be interviewed as he was undergoing treatment. The next day, Detective Parker met with Payne but Payne refused to identify the shooter. On April 26, 2012, Detective Parker interviewed Fleming at Southwest Detectives and obtained a statement from him regarding Payne's shooting. Fleming told him that on March 27, 2012, he was kidnapped by three armed men, who forced him into a car. The three men beat him and stole his two cell phones and $90[.00] in cash, before driving him back to his home and demanding that he get more money for them. Fleming told Detective Parker that he went into his house, retrieved a firearm, and shot one of his abductors, later identified as Payne. Detective Parker testified that Fleming reviewed the written statement, initialed each page, and signed at the bottom.

Samir Green ("Green") testified next. He stated that on May 2, 2012, he was 15 years old and was spending time with his friend Yasin Harvey ("Harvey"). He and Harvey, along with two other friends, were standing outside of a store at the corner of 62nd and Callowhill, when a dark Pontiac with tinted windows pulled up and someone began shooting at them. Green testified that he saw someone leaning out [of] the front passenger window, firing a gun with his arm fully extended. He described the shooter as "[b]rown skinned, caramel" but did not get a good look at the shooter's face. Green stated that when he realized bullets were flying, he ran and ducked behind parked cars. After the Pontiac drove away, Green came out of hiding and saw Harvey lying in the street, trying to get up. Green ran inside a nearby house to hide in case the shooter returned. He testified that he looked out the window and saw people running to help Harvey so he and his friends returned outside and waited until Harvey was transported to the hospital. Green gave a statement to detectives later that same day.

Police Officer Jasmin Torres testified next for the Commonwealth. Officer Torres stated that on May 2, 2012, she and her partner, Officer Benson, heard gunshots near police headquarters. She then received a radio call, indicating that

someone had been shot near 62nd and Callowhill. When she arrived on the scene, she saw Harvey lying on the ground between two vehicles, covered in blood. Officer Torres put him in the backseat of her police vehicle and drove him to the emergency room. She remained at the hospital until Harvey was pronounced dead by medical personnel.

Next, Police Officer Gregory Yatcilla of the Crime Scene Unit testified. He stated that he responded to the report of a shooting at 62nd and Callowhill Streets. He took photographs of the scene and collected evidence, including blood samples, two bullets specimens and seven fired shell casings.

Police Officer John Cannon testified next as an expert in the identification and testing of firearms and ammunition. He stated that he analyzed the fired cartridge cases and two bullets recovered from the scene of the shooting [at 62nd and Callowhill Streets] and cross-checked them against ballistics evidence recovered from the March 27, 2012 shooting of Jamal Payne on Edgemore Road. He determined that the fired cartridge cases all came from the same firearm.

Farid Brown ("Brown") testified next for the Commonwealth. He denied that he was in the area of 62nd and Callowhill Streets on May 2, 2012 when Yasin Harvey was shot. He also denied giving a statement to Homicide Detective Tracy Byard on May 10, 2012, wherein he admitted being present at the scene of Harvey's death. In this written statement, which he initialed and signed, Brown told detectives that he knew [Appellant] and Fleming "from playing basketball," and that Fleming drove a dark green Pontiac Grand Prix. Brown further told detectives that on May 2, 2012 he was at the store on the corner of 62nd and Callowhill and heard gunshots.

Next, Police Sergeant Bob Wilkins testified. He stated that he met with [Appellant] at police headquarters on August 25, 2012 and questioned him regarding the murder of Yasin Harvey. In his statement, [Appellant] told Sergeant Wilkins that Kareem Terry, a/k/a "Reem," shot Harvey[. In addition, Appellant] relayed the following version of events: [Appellant], another man and Kareem were driving around in a car together, smoking weed and on their way to meet some girls. As they drove by the corner of Felton and Callowhill, the driver stopped and Kareem rolled down the window and started shooting from the back seat,

trying to hit Farid Brown before he entered the corner store. This was a retaliatory response to Farid Brown's murder of Stephen Hamilton, [Appellant's] best friend. When Kareem was done shooting, the driver of the vehicle then sped away. [Appellant asked,] "What the fuck is wrong with you all?" and then jumped out of the front passenger seat at the next red light. He said [he] never saw the driver or Kareem Terry again.

Sergeant Wilkins testified that [Appellant] told him he hadn't come forward with this information sooner because he was scared and knew he had outstanding warrants on unrelated matters. Wilkins showed [Appellant] a photograph of Yasin Harvey; however, [Appellant] told him that he did not know Harvey and was unable to identify him from the photograph.

Gary L. Collins, M.D., Deputy Chief Medical Examiner, testified as an expert in forensic pathology. He testified that he examined Yasin Harvey's body and determined that he died as a result of multiple gunshot wounds: one to his head, two to his chest, and one to his arm. The gunshots to the chest would have been fatal to Harvey even if he had not been fatally shot in the head.

Next, Police Officer Ronald Burgess testified for the Commonwealth. He stated that on May 9, 2012, he spotted Fleming driving in a dark green Pontiac vehicle with heavily tinted windows that matched the description of the car involved in Harvey's shooting. He stopped the vehicle and discovered that Kareem Terry, the car's owner, was sitting in the front passenger seat. Both Fleming and Terry were taken into custody. Burgess testified that he knew the area of 62nd and Callowhill very well, and knew Jamal Payne to frequent this area.

Detective Tracy Byard testified next. He stated that he executed a search warrant at Fleming's house and recovered several pieces of mail as well as a funeral card for the services of Stephan C. Hamilton. Byard further testified that during the course of the investigation, he came into contact with [Appellant], and noted that [Appellant] had the numbers "six four" surrounded by skulls tattooed on his arms, as well as the word "Callowhill" tattooed across his back. Byard stated that he and his fellow police officers searched for [Appellant] from May 8, 2012 until August 25, 2012, when he was finally apprehended.

- 4 -

Kareem Terry ("Terry") testified next for the Commonwealth. Terry stated that on May 2, 2012, Fleming (also known as "Lihj") and [Appellant] (also known as "Dot") picked him up at his home. Terry testified that Fleming was driving the car, [Appellant] was in the front passenger seat, and he was in the backseat alone. As they drove down 62nd Street, Fleming spotted a group of males on the corner. He circled the block and then pointed out the males as members of "Deuce." [Appellant] began firing a gun at them. Terry testified that [Appellant] shot approximately six times. Fleming drove away, and turned down a small block between Callowhill and Vine Streets. Terry testified that his ears were ringing from the gunshots so he asked to be let out of the vehicle. He then walked back to his house at Callowhill and Simpson Streets. Three days later, on May 5, 2012, Terry was taken into police custody. He testified that he told the police that the car Fleming was driving was registered [in Terry's name] but that it actually belonged to Fleming. Fleming paid for the vehicle but gave Terry a couple hundred dollars to put the car's paperwork in Terry's name because Fleming did not have a valid driver's license. Terry then reviewed the statement he gave police on May 5, 2012. In this statement, he described the shooting as follows:

Like I said, it was Dot who shot at the crowd and the boy must have been in the crowd. I was in the back seat of the car when Dot lit up the crowd. The car is in my name but Lihj gave me some money to put the car in my name. I ride around with them once in a while but the car is in my name for the papers only. Lihj always drives that car.

The night the boy got killed I was riding with Lihj and Dot. Dot was in the front on the passenger side. Lihj was driving. Lihj drove by Sixty-Second Street and there was a crowd on the corner. Lihj drove by it and then went around the corner and started coming up on the crowd again. Lihj told Dot, yo, there goes them Deuce niggas right there, shoot them. Dot then pulled a gun from I think from under the seat or the side well on the door cause I seen him reach down. I didn't know there was a gun in the car. I just seen Dot reach down, then come up with the gun and he started lighting up the crowd that was there.

Then Lihj drove off. I was like what the fuck. Lihj got to like Sixty-Third and Vine and I was yelling, yo, let me the

- 5 -

> fuck out. I didn't want no part of anything. I got out of the car and Lihj and Dot drove off. You see, Sixty-Fourth and Callowhill been going through it with anybody on Callowhill that is on the other side of Sixty-Third Street. I just walked off and went home.
>
> The next day I was around on Sixty-Fourth and Dot and Lihj were talking about it and word was out one of the boys in the crowd that got hit died. Lihj was saying how he still had the gun in his car. That's when Dot told Lihj, yo, you got to get rid of that gun. Lihj said he would get rid of it but I don't know what he did with it.

Terry testified that Fleming was the leader of the 64th and Callowhill gang and that he "has everyone else do his dirty work." He further testified that Fleming previously had been kidnapped by members of Deuce and that there had been a lot of "back and forth" after that between the two gangs. Terry stated that he was currently incarcerated, awaiting trial for attempted murder, that he had immunity with respect to his involvement in the murder of Yasin Harvey, but he did not have any deals with the Commonwealth that would benefit him in his ongoing attempted murder case. He stated that Fleming called him at home from prison several times after his arrest. A redacted audio recording of these phone calls was then played for the jury. Terry testified that during the phone conversations, Fleming instructed Terry not to point the finger at him and told him not to tell the police that Fleming initiated everything. Terry assured Fleming that he was not going to testify in court; however, he appeared at the preliminary hearing and identified Fleming as the driver of the vehicle.

At the conclusion of Terry's testimony, counsel [for the parties] entered evidence [into the record] by way of stipulation[.] Counsel first stipulated to a certificate of non-licensure, stating that Fleming was not licensed to carry a firearm. Counsel then stipulated to another certificate of non-licensure, indicating that [Appellant] was not licensed to carry a firearm. The Commonwealth moved its exhibits into evidence and rested. Fleming's counsel moved for a judgment of acquittal. This motion was denied and the defense rested. The jury found [Appellant] guilty of first-degree murder, criminal conspiracy, and carrying a firearm without a license.

[The trial court, on May 15, 2014, sentenced Appellant to the mandatory sentence of life imprisonment without the possibility of parole. In addition, Appellant received 10 to 20 years' incarceration on the conspiracy charge and 3½ to 7 years' imprisonment for carrying a firearm without a license. The trial court directed that these sentences run concurrently with Appellant's term of life imprisonment. Appellant did not file post-sentence motions. A notice of appeal was filed on June 3, 2014. Thereafter, on June 9, 2014, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Trial counsel timely complied on June 30, 2014. Appellant raises the following issues for review: (1) whether the verdict was against the weight of the evidence; (2) whether the trial court erred in redacting Appellant's statement to police by making it appear that he was "covering up" for someone; (3) whether Appellant was improperly prejudiced by the redaction of his co-defendant's prison phone conversations; and (4) whether the prosecutor improperly raised issues of "witness fear and intimidation" and expressed his own personal opinions during closing arguments.]

Trial Court Opinion, 12/17/14, at 1-8 (last paragraph setting forth procedural history summarized from trial court's opinion at 1-2).

We have carefully reviewed the certified record, the submissions of the parties, and the thorough opinion issued by the trial court. Based upon our review, we are persuaded that the trial court has adequately and accurately assessed each of the claims raised on appeal. We therefore concur with the trial court's determinations that: (1) Appellant waived his challenge to the weight of the evidence and, alternatively, the claim was meritless; (2) the court properly redacted Appellant's statement to police in order to protect his co-defendant's Sixth Amendment rights and "the redaction did not destroy the narrative integrity of [Appellant's] statement to police and did not prevent [Appellant] from using the statement in his defense"; (3) the

- 7 -

court's redaction of an entire prison telephone conversation between co-defendant Fleming and an unknown male was necessary to protect Fleming's Fifth Amendment rights and to conform the evidence to the court's prior ruling that suppressed Fleming's statement to police; and, (4) Appellant waived any challenge to the prosecutor's closing argument and, in any event, there was no prosecutorial misconduct since the prosecutor's comments regarding the credibility of certain witnesses and his references to witness intimidation were based on evidence appearing in the record and were made in response to arguments raised by defense counsel. Trial Court Opinion, 12/17/14, at 9-19. Since the record supports the trial court's findings and since the court's conclusions are consistent with applicable Pennsylvania law, we adopt the court's assessments as our own. We direct the parties to include a copy of the trial court's opinion with all future filings relating to the disposition of this appeal.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/16/2016

Filed 04/20/2015 Superior Court Eastern District
1728 EDA 2014

## IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CRIMINAL TRIAL DIVISION

| COMMONWEALTH | : | **CP-51-CR-0001342-2013** |
|---|---|---|

CP-51-CR-0001342-2013 Comm. v. Brown, Justin
Opinion

7235576431

vs.

**FILED**

DEC 17 2014

Criminal Appeals Unit
JUSTIN BROWN   First Judicial District of PA

**SUPERIOR COURT
1728 EDA 2014**

## OPINION

**BRINKLEY, J.**                                        **DECEMBER 17, 2014**

A jury found Defendant Justin Brown guilty of Murder of the First Degree, Criminal Conspiracy, and one Violation of the Uniform Firearms Act § 6106: Carrying a Firearm without a License. This Court imposed the mandatory sentence of life imprisonment without the possibility of parole. Defendant was further sentenced to 10 to 20 years state incarceration on the conspiracy charge, and 3 ½ to 7 years state incarceration on the § 6106 charge, to run concurrently with his term of life imprisonment. Defendant appealed this judgment of sentence to the Superior Court and raised the following issues for appellate review: (1) whether the verdict was against the weight of the evidence; (2) whether the Court erred in redacting Defendant's statement by making it appear that he was "covering up" for someone; (3) whether Defendant was improperly prejudiced by the redaction of his co-defendant's prison phone conversations; and (4) whether the prosecutor improperly raised issues of "witness fear and intimidation" and expressed his own personal opinions during closing arguments. This Court's judgment of sentence should be affirmed.

## PROCEDURAL HISTORY

Sixteen-year-old Yasin Harvey was shot and killed on May 2, 2012 in a drive-by shooting in West Philadelphia. Defendant and co-defendant, Elijah Fleming ("Fleming"), were arrested and charged with his murder. From May 7-15, 2014, Defendant and Fleming were tried together before a jury. Defendant was represented by Jack McMahon, Esquire. The jury found Defendant guilty of first degree murder, criminal conspiracy, and carrying a firearm without a license. On May 15, 2014, this Court sentenced him to the mandatory sentence of life imprisonment without the possibility of parole. Defendant was further sentenced to 10 to 20 years state incarceration on the conspiracy charge, and 3 ½ to 7 years state incarceration on the § 6106 charge, to run concurrently with his term of life imprisonment. No post sentence motions were filed. On June 3, 2014, Defendant filed a Notice of Appeal to the Superior Court. On June 9, 2014, this Court ordered Defendant to file a Concise Statement of Errors Pursuant to Pa. R.A.P. 1925(b) and defense counsel did so on June 30, 2014.

## FACTS

From May 7-15, 2014, this Court conducted a jury trial in this matter. Police Officer Kevin Dorin testified first for the Commonwealth. Officer Dorin stated that on March 27, 2012, he responded to a report of gunshots on the 600 block of Edgemore Road. He observed six shell casings on the scene, contacted Southwest Detectives, and then waited for them to arrive. (N.T. 5/7/14, p. 90-95).

Detective Vincent Parker testified next. He stated that on March 27, 2012, he and his partner, Detective Ortiz, investigated the shooting on the 600 block of Edgemore Road. At the scene, he discovered six shell casings and two bullet projectiles. After speaking with two neighbors in the area, Detective Parker went to the hospital to speak with victim Jamal Payne

2

("Payne"); however, he was unable to be interviewed as he was undergoing treatment. The next day, Detective Parker met with Payne but Payne refused to identify the shooter. On April 26, 2012, Detective Parker interviewed Fleming at Southwest Detectives and obtained a statement from him regarding Payne's shooting. Fleming told him that on March 27, 2012, he was kidnapped by three armed men, who forced him into a car. The three men beat him and stole his two cell phones and $90 in cash, before driving him back to his home and demanding that he get more money for them. Fleming told Detective Parker that he went into his house, retrieved a firearm, and shot one of his abductors, later identified as Payne. Detective Parker testified that Fleming reviewed the written statement, initialed each page, and signed at the bottom. Id. at 96-122.

Samir Green ("Green") testified next. He stated that on May 2, 2012, he was 15 years old and was spending time with his friend Yasin Harvey ("Harvey"). He and Harvey, along with two other friends, were standing outside of a store at the corner of 62nd and Callowhill, when a dark Pontiac with tinted windows pulled up and someone began shooting at them. Green testified that he saw someone leaning out the front passenger window, firing a gun with his arm fully extended. He described the shooter as "[b]rown skinned, caramel" but he did not get a good look at the shooter's face. Green stated that when he realized bullets were flying, he ran and ducked behind parked cars. After the Pontiac drove away, Green came out of hiding and saw Harvey lying in the street, trying to get up. Green ran inside a nearby house to hide in case the shooter returned. He testified that he looked out the window and saw people running to help Harvey so he and his friends returned outside and waited until Harvey was transported to the hospital. Green gave a statement to detectives later that same day. Id. at 139-162.

3

Police Officer Jasmin Torres testified next for the Commonwealth. Officer Torres stated that on May 2, 2012, she and her partner, Officer Benson, heard gunshots near police headquarters. She then received a radio call, indicating that someone had been shot near 62nd and Callowhill. When she arrived on the scene, she saw Harvey lying on the ground between two vehicles, covered in blood. Officer Torres put him in the backseat of her police vehicle and drove him to the emergency room. She remained at the hospital until Harvey was pronounced dead by medical personnel. (N.T. 5/8/14, p. 17-20).

Next, Police Officer Gregory Yatcilla of the Crime Scene Unit testified. He stated that he responded to the report of a shooting at 62nd and Callowhill Streets. He took photographs of the scene and collected evidence, including blood samples, two bullets specimens and seven fired shell casings. Id. at 24-54.

Police Officer John Cannon testified next as an expert in the identification and testing of firearms and ammunition. He stated that he analyzed the fired cartridge cases and two bullets recovered from the scene of the shooting and cross-checked them against ballistics evidence recovered from the March 27, 2012 shooting of Jamal Payne on Edgemore Road. He determined that the fired cartridge cases all came from the same firearm. Id. at 74-94.

Farid Brown ("Brown") testified next for the Commonwealth. He denied that he was in the area of 62nd and Callowhill Streets on May 2, 2012 when Yasin Harvey was shot. He also denied giving a statement to Homicide Detective Tracy Byard on May 10, 2012, wherein he admitted being present at the scene of Harvey's death. In this written statement, which he initialed and signed, Brown told detectives that he knew Defendant and Fleming "from playing basketball," and that Fleming drove a dark green Pontiac Grand Prix. Brown further told

4

detectives that on May 2, 2012 he was at the store on the corner of 62nd and Callowhill and heard gunshots. Id. at 104-116.

Next, Police Sergeant Bob Wilkins testified. He stated that he met with Defendant at police headquarters on August 25, 2012 and questioned him regarding the murder of Yasin Harvey. In his statement, Defendant told Sergeant Wilkins that Kareem Terry, a/k/a "Reem," shot Harvey and relayed the following version of events: Defendant, another man and Kareem were driving around in a car together, smoking weed and on their way to meet some girls. As they drove by the corner of Felton and Callowhill, the driver stopped and Kareem rolled down the window and started shooting from the back seat, trying to hit Farid Brown before he entered the corner store. This was a retaliatory response to Farid Brown's murder of Stephan Hamilton, Defendant's best friend. When Kareem was done shooting, the driver of the vehicle then sped away. Defendant asked, "What the fuck is wrong with you all?" and then jumped out of the front passenger seat at the next red light. He said never saw the driver or Kareem Terry again.

Sergeant Wilkins testified that Defendant told him he hadn't come forward with this information sooner because he was scared and knew he had outstanding warrants on unrelated matters. Wilkins showed Defendant a photograph of Yasin Harvey; however, Defendant told him that he did not know Harvey and was unable to identify him from the photograph. (N.T. 5/8/14, p. 156-191).

Gary L. Collins, M.D., Deputy Chief Medical Examiner, testified as an expert in forensic pathology. He testified that he examined Yasin Harvey's body and determined that he died as a result of multiple gunshot wounds: one to his head, two to his chest, and one to his arm. The gunshots to the chest would have been fatal to Harvey even if he had not been fatally shot in the head. Id. at 217-225.

5

Next, Police Officer Ronald Burgess testified for the Commonwealth. He stated that on May 9, 2012, he spotted Fleming driving in a dark green Pontiac vehicle with heavily tinted windows that matched the description of the car involved in Harvey's shooting. He stopped the vehicle and discovered that Kareem Terry, the car's owner, was sitting in the front passenger seat. Both Fleming and Terry were taken into custody. Burgess testified that he knew the area of 62nd and Callowhill very well, and knew Jamal Payne to frequent this area. (N.T. 5/9/14, p. 13-17).

Detective Tracy Byard testified next. He stated that he executed a search warrant at Fleming's house and recovered several pieces of mail as well as a funeral card for the services of Stephan C. Hamilton. Byard further testified that during the course of the investigation, he came into contact with Defendant, and noted that Defendant had the numbers "six four" surrounded by skulls tattooed on his arms, as well as the word "Callowhill" tattooed across his back. Byard stated that he and his fellow police officers searched for Defendant from May 8, 2012 until August 25, 2012, when he was finally apprehended. Id. at 22-45.

Kareem Terry ("Terry") testified next for the Commonwealth. Terry stated that on May 2, 2012, Fleming (also known as "Lihj") and Defendant (also known as "Dot") picked him up at his home. Terry testified that Fleming was driving the car, Defendant was in the front passenger seat, and he was in the backseat alone. As they drove down 62nd Street, Fleming spotted a group of males on the corner. He circled the block and then pointed out the males as members of "Deuce." Defendant began firing a gun at them. Terry testified that Defendant shot approximately six times. Fleming drove away, and turned down a small block between Callowhill and Vine Streets. Terry testified that his ears were ringing from the gunshots so he asked to be let out of the vehicle. He then walked back to his house at Callowhill and Simpson

6

Streets. Three days later, on May 5, 2012, Terry was taken into police custody. He testified that he told the police that the car Fleming was driving was registered to Terry but that it actually belonged to Fleming. Fleming paid for the vehicle but gave Terry a couple hundred dollars to put the car's paperwork his Terry's name because Fleming did not have a valid driver's license. Terry then reviewed the statement he gave police on May 5, 2012. In this statement, he described the shooting as follows:

> Like I said, it was Dot who shot at the crowd and the boy must have been in the crowd. I was in the back seat of the car when Dot lit up the crowd. The car is in my name but Lihj gave me some money to put the car in my name. I ride around with them once in a while but the car is in my name for the papers only. Lihj always drives that car.
>
> The night the boy got killed I was riding with Lihj and Dot. Dot was in the front on the passenger side. Lihj was driving. Lihj drove by Sixty-Second Street and there was a crowd on the corner. Lihj drove by it and then went around the corner and started coming up on the crowd again. Lihj told Dot, yo, there goes them Deuce niggas right there, shoot them. Dot then pulled a gun from I think from under the seat or the side well on the door cause I seen him reach down. I didn't know there was a gun in the car. I just seen Dot reach down, then come up with the gun and he started lighting up the crowd that was there.
>
> Then Lihj drove off. I was like what the fuck. Lihj got to like Sixty-Third and Vine and I was yelling, yo, let me the fuck out. I didn't want no part of anything. I got out of the car and Lihj and Dot drove off. You see, Sixty-Fourth and Callowhill been going through it with anybody on Callowhill that is on the other side of Sixty-Third Street. I just walked off and went home.
>
> The next day I was around on Sixty-Fourth and Dot and Lihj were talking about it and word was out one of the boys in the crowd that got hit died. Lihj was saying how he still had the gun in his car. That's when Dot told Lihj, yo, you got to get rid of that gun. Lihj said he would get rid of it but I don't know what he did with it.

Id. at 79-81 (from written police statement of Kareem Terry, dated 5/5/12). Terry testified that Fleming was the leader of the 64[nd] and Callowhill gang and that he "has everyone else do his

7

dirty work." He further testified that Fleming previously had been kidnapped by members of Deuce and that there had been a lot of "back and forth" after that between the two gangs. Terry stated that he was currently incarcerated, awaiting trial for attempted murder, that he had immunity with respect to his involvement in the murder of Yasin Harvey, but he did not have any deals with the Commonwealth that would benefit him in his ongoing attempted murder case. He stated that Fleming called him at home from prison several times after his arrest. A redacted audio recording of these phone calls was then played for the jury. Terry testified that during the phone conversations, Fleming instructed Terry not to point the finger at him and told him not to tell the police that Fleming initiated everything. Terry assured Fleming that he was not going to testify in court; however, he appeared at the preliminary hearing and identified Fleming as the driver of the vehicle. Id. at 81-141.

At the conclusion of Terry's testimony, counsel entered evidence by way of stipulation by and between counsel. Counsel first stipulated to a certificate of non-licensure, stating that Fleming was not licensed to carry a firearm. Counsel then stipulated to another certificate of non-licensure, indicating that Defendant was not licensed to carry a firearm. The Commonwealth moved its exhibits into evidence and rested. Fleming's counsel moved for a judgment of acquittal. This motion was denied and the defense rested. The jury found Defendant guilty of first degree murder, criminal conspiracy, and carrying a firearm without a license.

## ISSUES

I.    WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

II.   WHETHER DEFENDANT'S STATEMENTS TO POLICE WERE PROPERLY REDACTED.

III.  WHETHER THE RECORDED PRISON PHONE CALLS WERE PROPERLY REDACTED.

8

IV.    WHETHER THE PROSECUTOR'S CLOSING STATEMENT WAS IMPROPER.

## DISCUSSION

### I.    THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

Defendant claims that the verdict was against the weight of the evidence.  As a threshold matter, Defendant has not preserved this claim for appellate review.  A challenge to the weight of the evidence must be raised with the trial judge or it will be waived.  Pennsylvania Rule of Criminal Procedure 607 requires that a "claim that the verdict is against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion."  This claim must be presented to the trial court while it exercises jurisdiction over a matter since "appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." Commonwealth v. Burkett, 830 A.2d 1034, 1037 (2003) (quoting Widmer, 744 A.2d at 753).

In the case at bar, Defendant did not raise this claim orally or in writing prior to sentencing. The record shows that the jury reached its verdict of guilty on May 15, 2014 and that Defendant was sentenced that same day.  At no time between verdict and sentencing did defense counsel make a motion for a new trial. Furthermore, he failed to raise this claim in a post-sentence motion. In fact, a review of the docket shows that Defendant did not file any post-sentence motions. Since Defendant failed to comply with Pa. R. Crim. P. 607, his claim is waived.

Even if the issue is not waived, the verdict was not against the weight of the evidence.  A weight of the evidence claim concedes that the evidence was sufficient to sustain the verdict.

9

Commonwealth v. Smith, 2007 PA Super. 77, 853 A.2d 1020, 1028 (citing Commonwealth v. Bennett, 2003 PA Super. 212, 827 A.2d 469 (2003)). The weight of the evidence is "exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Rice, 2006 PA Super. 143, 902 A.2d 542, 546 (2006) (quoting Commonwealth v. Champney, 574 Pa. 435, 832 A.2d 403, 408 (2003)). An appellate court cannot substitute its judgment for that of the fact finder; therefore, a verdict will be reversed only in the extraordinary situation where the verdict is "so contrary to the evidence as to shock one's sense of justice" and the award of a new trial is imperative so that right may be given another opportunity to prevail. Commonwealth v. Tharp, 574 Pa. 202, 830 A.2d 519, 528 (2003) (citing Commonwealth v. Brown, 538 Pa. 410, 648 A.2d 1177, 1189 (1994)); Commonwealth v. Smith, 580 Pa. 392, 861 A.2d 892, 896 (2004) (citing Commonwealth v. Drumheller, 570 Pa. 117, 808 A.2d 893, 908 (2002)).

In the case at bar, the jury properly assessed the evidence and based its guilty verdicts upon that evidence. The jury, as fact-finder, was free to believe all, part, or none of the evidence presented, and, as discussed in Tharp and Smith (*supra*), its conclusion should not be disturbed unless it "shocks one's sense of justice." That is not the case here. During the trial, the jury was able to observe the demeanor of each witness and found the police detectives and, more importantly, Kareem Terry, to be credible witnesses. The jury found Defendant's version of events, as described in his written statement to detectives where he claimed that Terry was the shooter, to be incredible.

The evidence adduced at trial established that Defendant was a member of the "64th and Callowhill" gang, as demonstrated by his tattoos and close association with Fleming. The "64th and Callowhill" gang was involved in ongoing retaliatory conduct with a rival gang, the "62nd

10

and Callowhill" gang, more simply known as "Deuce." Members of Deuce had murdered Defendant's best friend, Stephan Hamilton, and previously had kidnapped and robbed Fleming. Fleming admitted to shooting Jamal Payne, one of his Deuce abductors. Terry testified at trial that in retaliation for Deuce's actions, Fleming drove by the corner of 62nd and Callowhill Streets in his dark green Pontiac, pointed out members of "Deuce" and Defendant began shooting from the front passenger seat. Yasin Harvey, a 16-year-old boy not associated with either group, was shot and killed. The ballistics from this shooting were analyzed and police determined that it was the same gun that Fleming used to shoot Jamal Payne. Samir Green was standing with Harvey on the corner and testified that he saw a dark green Pontiac drive by and that someone in the front passenger seat shot at him and his friends. Farid Brown refused to testify at trial but in his written statement to police, he stated that he was standing on the corner of 62nd and Callowhill when he saw a dark green Pontiac drive by and begin shooting, that he knew Fleming and Defendant from around the neighborhood, and that he knew Fleming to drive a dark green Pontiac. Based upon this evidence, the jury's finding of guilt cannot be said to "shock one's sense of justice." Accordingly, this jury's verdict should not be disturbed on appeal.

## II.   DEFENDANT'S POLICE STATEMENT WAS PROPERLY REDACTED TO PROTECT HIS SIXTH AMENDMENT RIGHTS AND DID NOT MAKE IT APPEAR TO THE JURY THAT HE WAS "COVERING UP" FOR ANYONE.

This Court properly redacted the statements of Defendant and Fleming in order to preserve Fleming's Sixth Amendment rights. Furthermore, even if any errors were committed during redaction, there was no harm to Defendant. Whether multiple defendants' cases should be consolidated for trial "is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." Commonwealth v. Melvin, 2014 PA Super 181, --- A.3d ---, pg. 17 (2014) (citing

11

Commonwealth v. Boyle, 733 A.2d 633, 635 (Pa.Super. 1999)). Joint trials are favored when judicial economy will be served by avoiding the expensive and time-consuming duplication of evidence, and where the defendants are charged with conspiracy. Commonwealth v. Akbar, 2014 PA Super 89, 91 A.3d 227, 232 (2014) (citing Commonwealth v. Birdsong, 611 Pa. 203, 24 A.3d 319, 336 (2011)). Separate trials of co-defendants should be granted only where the defenses of each are antagonistic to the point where such individual differences are irreconcilable and a joint trial would result in prejudice. Commonwealth v. Rainey, 593 Pa. 67, 928 A.2d 215, 232 (2007) (citing Commonwealth v. Lambert, 529 Pa. 320, 603 A.2d 568, 573 (1992)). Just as severance is not required where one defendant may try to save himself at the expense of the other, neither is it required where one has tried to save the other at the expense of himself. Commonwealth v. Gribble, 580 Pa. 647, 863 A.2d 455, 462-63 (2004).

Under the Confrontation Clause of the Sixth Amendment, a criminal defendant has a right to confront witnesses against him. Akbar, 91 A.3d at 232 (citing Commonwealth v. Rivera, 565 Pa. 289, 773 A.2d 131, 137 (2000)). A defendant is deprived of his Sixth Amendment rights when his non-testifying co-defendant's facially incriminating confession is introduced at their joint trial, even if the jury is instructed that the confession can be considered only against the confessing co-defendant. Id. Nevertheless, if a confession can be edited so that it retains its narrative integrity and yet in no way refers to the non-confessing defendant, then use of it does not violate the principles of the Sixth Amendment. Id. (citing Commonwealth v. Travers, 564 Pa. 362, 768 A.2d 845, 848 (2001)). In Travers, the Pennsylvania Supreme Court held that the redaction of a nontestifying co-defendant's confession in a joint trial, which replaced any direct reference to the non-confessing co-defendant with a neutral pronoun, in this case "the other guy," sufficiently protected the non-confessing defendant's Sixth Amendment rights. Id. Pennsylvania

12

courts have further upheld the redaction of a defendant's statement to read "one of the guys" in order to protect a co-defendant's Sixth Amendment rights on the basis that such a redacted statement still allowed the defendant to provide a defense. See Commonwealth v. Garcia, 2004 PA Super 61, 847 A.2d 67, 72-73 (2004).

In the case at bar, this Court properly redacted Defendant's statement to the police in order to protect his co-defendant Fleming's Sixth Amendment rights. Furthermore, any error in redacting Defendant's statement was harmless and could not have contributed to the guilty verdict. This Court redacted Defendant's statement to police to change any reference to Fleming to "the other man." Defendant argued that this redaction made it seem as though he was "covering" for an unnamed individual and therefore was not forthcoming with the police when he gave his statement. However, this redaction was necessary to preserve Fleming's Sixth Amendment right to confrontation as it was a facially incriminating statement of a non-testifying co-defendant. Furthermore, the redaction did not destroy the narrative integrity of Defendant's statement to police and did not prevent Defendant from using the statement in his defense. In his own statement to police, Defendant claimed that Kareem Terry was the shooter. This defense was unaffected by the redacted references to Fleming, which referred to Fleming as "the other man" and simply stated that "the other man" was driving the car. The jury could have assumed that Defendant did not know the name of the car's driver. Since the jury ultimately concluded that Defendant, not Terry, was the shooter, the jurors obviously found that Defendant's statement as a whole was not credible. Moreover, there is nothing to indicate that changing Defendant's co-defendant's name to "the other man" in any way contributed to the guilty verdict. As discussed above in Section I, there was more than sufficient evidence implicating Defendant in the murder of Yasin Harvey. Accordingly, the jury's finding of guilt should be affirmed.

13

## III. THE RECORDED PRISON PHONE CALLS WERE PROPERLY REDACTED TO PROTECT FLEMING'S FIFTH AMENDMENT RIGHTS AND DID NOT PREJUDICE DEFENDANT.

This Court properly redacted a phone conversation between Fleming and an unknown male in order to protect Fleming's Fifth Amendment rights. This Court ruled prior to trial that Fleming's statement to police was obtained in violation of his Fifth Amendment rights and must be suppressed. Consequently, this Court ruled that any references to Fleming having made a statement to police, including in recorded phone conversations in which Fleming discussed what he told police, were to be precluded at trial. At trial, this Court and counsel reviewed the transcripts of recorded prison phone calls in order to eliminate any reference to Fleming's police statement. While doing so, they read the following conversation between Fleming and an unknown male:

> Fleming: To clear his name dog. I swear to God the law gonna think Reem is the best guy cause I was trynna clear [D]ot name. I'm talking about real shit man.
>
> Male voice: I hear you.
>
> Fleming: I'm like listen I told the law like listen I'll keep it real with you my man Dot [Defendant], I ain't seen Dot [Defendant] in like five minutes, he ain't do shit they threw me on the table...

(N.T. 5/9/2014 p. 152-53). Defendant argued that this statement should be redacted to remove "I told the law," in order to read, "I'm like listen, I'll keep it real with you, my man Dot [Defendant], I ain't seen Dot [Defendant] in like five minutes. He ain't do shit." Id. at 152, 154. The Commonwealth argued that the entire statement should be redacted because Fleming was explaining to the unknown male what he told the police in his statement, and Fleming's entire statement to police had been suppressed by this Court. The Commonwealth further argued that Defendant's proposed redaction fundamentally changed the meaning of the statement from "I

14

told the police that I haven't seen Defendant and he didn't do anything" to "I haven't seen Defendant and he did nothing." Id. at 153-55. In addition, the Commonwealth noted that Fleming in fact did tell the police in his statement that Defendant was the shooter and was lying to the unknown male on the phone. Id. at 163-64. Defendant argued in response that Fleming was not explaining what he told the police, but was stating it as a fact that he had not seen Defendant and that Defendant did nothing. Id. at 159. Defendant further argued that the joint trial with Fleming prejudiced him because, if he had a separate trial, the entire conversation would be admissible and the jury would have heard this allegedly exculpatory statement. Id. at 156, 160. At the conclusion of argument by both defense counsel, this Court ruled that Fleming was recounting the story he had told the police and was not stating a fact. Therefore, the statement was covered by this Court's ruling that all references to Fleming's conversations with police were to be suppressed. Id. at 157-162, 168. Consequently, this Court redacted the entire statement. Id. at 168-69.

This Court's redaction of the phone conversation was necessary to protect Fleming's Fifth Amendment right and conform with this Court's prior ruling suppressing Fleming's statement to police. A plain reading of the conversation between Fleming and the unknown male shows that Fleming was discussing what he told the police rather than asserting a fact. As such, the reference had to be suppressed consistent with this Court's ruling that the co-defendant's statement was obtained in violation of his Fifth Amendment rights. Furthermore, Defendant's claim that the redaction prejudiced him, because the statement would have been admissible in a separate trial, was without merit. If Defendant was tried in a separate trial, and the statement made by his co-defendant was admissible, then not only would the jury have heard the entirety of the disputed line, as opposed to Defendant's proposed redaction, but also that Fleming told the

police that Defendant was the shooter. As such, it would have been more prejudicial to Defendant had the jury heard the entirety of Fleming's statement to police. Moreover, any error in redacting the phone conversation was harmless and did not contribute to the verdict. There was ample evidence presented at trial, including Terry's eyewitness testimony, that Defendant was the shooter. Whether Fleming told an unknown male that he told the police that Defendant did nothing would not have contributed to the verdict in light of the considerable evidence presented at trial. Accordingly, this Court's judgment of sentence should be affirmed.

## IV. THE PROSECUTOR DID NOT MAKE ANY IMPROPER REMARKS DURING HIS CLOSING STATEMENT.

The prosecutor did not engage in prosecutorial misconduct in his closing statements. Defendant argues that the "prosecutor in his closing expressed his personal opinion and constantly raised issues of witness fear and intimidation with absolutely no evidence to support this." After careful review of the Commonwealth's closing statement, this Court was unable to find any repeated, inappropriate references to witness fear and intimidation. In fact, this Court only found two references to witness intimidation, and both of these statements were made in response to arguments made in defense counsels' closing statements.

As a threshold matter, Defendant has not preserved this claim for appellate review. In order to raise a claim of alleged prosecutorial misconduct, Defendant must object to the misconduct in a timely manner; otherwise such a claim will not be available on appellate review. Commonwealth v. Cox, 603 Pa. 223, 983 A.2d 666, 685 (2009). Here, defense counsel never objected to any statement made by the prosecutor during his closing statement. Thus, this claim should be deemed waived.

Even if this claim was not waived, no relief is due. While a closing argument must be based upon evidence in the record or reasonable inferences therefrom, a prosecutor is permitted

16

to respond to defense evidence and engage in oratorical flair. Commonwealth v. Culver, 2012 PA Super 172, 51 A.3d 886, 878 (2012) (citing Commonwealth v. Basemore, 525 Pa. 512, 582 A.2d 861, 869 (1990)). Allegedly improper remarks of a prosecutor during closing arguments must be viewed in the context of the closing argument as a whole. Commonwealth v. Smith, 604 Pa. 126, 985 A.2d 886, 907 (2009) (quoting Commonwealth v. Washington, 549 Pa. 12, 700 A.2d 400, 407-08 (1997)). Although it is improper for a prosecutor to offer his or her personal opinion regarding the credibility of the defendant or other witness, the prosecutor is permitted comment upon credibility. Commonwealth v. Sanchez, 82 A.3d 943, 981 (Pa. 2013) (citing Commonwealth v. Chmiel, 585 Pa. 547, 889 A.2d 501, 545 (2005)). Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. Id. at 981, n.7 (citing Commonwealth v. Smith, 606 Pa. 127, 995 A.2d 1143, 1157 (2010)). However, even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. Commonwealth v. Burno, 96 A.3d 956, 974 (Pa. Super. 2014) (quoting Commonwealth v. Elliott, 80 .2d 415, 443 (Pa. 2013). Furthermore, a prosecutor's comments do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds a fixed bias and hostility towards the defendant so that they could not weigh the evidence objectively and render a true verdict. Id.

In the case at bar, there was no prosecutorial misconduct in the closing statement. In defense counsel's closing statement, he questioned whether Samir Green accurately could have recalled the shooting and claimed that Green made factual errors in his testimony. (N.T. 5/14/14, p. 58-59. In response, the prosecutor referred to Samir Green in his closing arguments as "about as credible a witness as you could possibly find" and "as credible a witness as you will ever hear

from." Id. at 110, 112. The prosecutor further stated that Green was a credible witness because he unequivocally and without hesitation testified that the shooter was sitting in the front passenger seat. Id. at 110, 112. In making these statements, the prosecutor was not offering his personal opinion as to Green's credibility but was merely responding to statements made by defense counsel that called into question Green's testimony and credibility.

Additionally, during his closing statement, the prosecutor made two separate references to Fleming intimidating Terry. Both of these statements were based upon evidence presented at trial and were in direct response to comments made in defense counsel's closing statements regarding Terry's involvement in the crime. First, the prosecutor described to the jury in his own words what happened when Terry and Fleming were pulled over by the police a few days after the murder: "He [Fleming] looks over at Kareem Terry and says don't fucking say a word, we're going down to Homicide." Id. at 120-21. The prosecutor was paraphrasing a recorded prison phone conversation between Terry and Fleming, where Fleming was upset with Terry for talking to the police and tells him, "Reem I fuckin told you I said before we go in there be ready for every trick dog I didn't tell you I said if they don't show you no paperwork that's not nothing that's how they do you you was at 8th and Race dog that's the best homicide detectives they gonna trick you and say that I tried to reassure you that before we went in there dog. You supposed to wait till you see paperwork." (Prison Tapes of Elijah Fleming, p. 10).

In the second instance where the prosecutor mentioned witness fear and intimation, the record shows that the prosecutor was putting into context a remark that Terry made to Fleming during a recorded prison phone call. During trial, the jury heard a recorded phone conversation between Fleming and Terry, in which Terry said, "I was down there on some real shit I sign off on that paper to get me out of the shit yeah, I wasn't like on no tip like [Fleming] did this

18

[Fleming] did that. Naw I like know I did this shit I was like naw." (Prison Tapes of Elijah Fleming, p. 14). The prosecutor told the jury, "This is about the statement. This is about ratting. This is about snitching. And, you know, this is their code. Remember what they say way back before he even calls [Terry]. Remember what it is. "If I see him, he's done." You don't snitch. You don't snitch when you're part of that group." Id. at 131. In his closing remarks, Defendant's counsel told the jury that Terry was implicating himself as the shooter when he said, "I know I did this shit." Hence, when the prosecutor stated in his own closing argument that Terry was referring to the police statement he signed when he said, "I know I did this shit," and was reassuring Fleming that he did not implicate him in the crime, the prosecutor was simply responding to remarks made by defense counsel.

Thus, there was no prosecutorial misconduct as both of the prosecutor's remarks that alluded to witness fear and intimidation were in direct response to arguments made by defense counsel in their own closings and were based upon evidence presented at trial. Accordingly, this Court's judgment of sentence should be affirmed.

19

## CONCLUSION

After review of the applicable statutes, case law and testimony, this Court committed no error. The verdict was not against the weight of the evidence. This Court properly redacted Defendant's statement to police by removing Fleming's name. In addition, Defendant was not prejudiced by the redaction of Fleming's recorded prison phone conversations to remove any reference to Fleming's suppressed police statement. Last, the prosecutor did not commit prosecutorial misconduct during his closing statement. Accordingly, this Court's judgment of sentence should be affirmed.

**BY THE COURT:**

_____

**J.**